## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CommScope, Inc., | ) | Civil Action No. 19-cv-15962-MCA-LDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| Rosenberger Technology (Kunshan) Co. Ltd., | ) | **JURY TRIAL DEMANDED** |
| Rosenberger Asia Pacific Electronic Co., Ltd., | ) | |
| Rosenberger Technology LLC, Rosenberger | ) | **FILED UNDER SEAL** |
| USA Corp., Rosenberger North America | ) | |
| Pennsauken, Inc., Rosenberger Site Solutions, | ) | **CONTAINS INFORMATION** |
| LLC, Rosenberger Hochfrequenztechnik | ) | **DESIGNATED ATTORNEYS' EYES** |
| GmbH & Co. KG, Northwest Instrument, | ) | **ONLY UNDER THE DISCOVERY** |
| Inc., CellMax Technologies AB, Janet Javier, | ) | **CONFIDENTIALITY ORDER** |
| and Robert Cameron, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

CommScope, Inc. ("CommScope"), for its amended complaint against Rosenberger Technology (Kunshan) Co. Ltd. ("Rosenberger China"), Rosenberger Asia Pacific Electronic Co., Ltd. ("Rosenberger Asia"), Rosenberger Technology LLC (the "Rosenberger Asia Office"), Rosenberger USA Corp. ("Rosenberger USA"), Rosenberger North American Pennsauken, Inc. (the "Rosenberger USA Office"), Rosenberger Site Solutions, LLC ("Rosenberger Site Solutions"), Rosenberger Hochfrequenztechnik GmbH & Co. KG ("Rosenberger Germany"), Northwest Instrument, Inc. ("NWI"), and CellMax Technologies AB ("CellMax") (collectively, "Rosenberger" or "Rosenberger Defendants"), and Janet Javier and Robert Cameron (collectively, "Individual Defendants," and together with the Rosenberger Defendants, the "Defendants"), alleges as follows on personal knowledge as to its own conduct, and on information and belief as to the conduct of others, except as otherwise indicated:

**INTRODUCTION**

1.      Plaintiff CommScope is a global leader in telecommunications infrastructure and is based in Hickory, North Carolina. CommScope's innovations in antennas and other wireless technologies have helped fuel the tremendous growth in connectivity worldwide. In addition to its other technologies, CommScope is a world leader in developing base station antennas ("BSAs"), which are a vital part of 21st century telecommunications infrastructure. Through years of research and development, CommScope has developed numerous trade secret technologies, including software, hardware, and related technical and business information, that allow it to design, develop, test, validate, qualify, and market its BSAs (CommScope's "BSA Trade Secrets"). Because of its best-in-class technology and commitment to customer service, all major United States wireless service providers use CommScope's BSAs. CommScope brings this case to stop the misappropriation of its BSA Trade Secrets and to protect the technology and customer relationships it has spent years and substantial resources developing.

2.      The Rosenberger Defendants are part of a multinational conglomerate that competes with CommScope in the sale of telecommunications equipment, including BSAs. The Rosenberger Defendants have over a billion dollars in annual revenue. But rather than competing fairly Rosenberger is using stolen CommScope trade secrets.

3.      The Rosenberger Defendants misappropriated CommScope's trade secrets, distributed them to Rosenberger entities around the world, and are now using them to develop, test, and sell infringing BSAs in the United States in direct competition with CommScope.

4.      The misappropriation began with Rosenberger China. This Chinese entity engaged in a years-long campaign of targeted hiring of dozens of CommScope employees. It targeted CommScope employees for hiring because of their access to confidential CommScope

information, then enticed them away from CommScope by paying significantly above-market rates—sometimes as much as double current salaries. These above-market salaries reflect the premium Rosenberger places on employees' ability to bring over confidential CommScope information and the development costs Rosenberger can avoid by unfairly piggybacking off CommScope's research and development.

5.      Rosenberger brought CommScope's information to the United States and is now using CommScope's trade secrets, including its trade secret software, at two offices in New Jersey: the Rosenberger Asia Office and the Rosenberger USA Office. Rosenberger is selling BSAs to CommScope customers in the United States that it designed, developed, tested, validated, qualified, or marketed using CommScope's trade secret software. And Rosenberger is selling BSAs that are knockoffs of CommScope BSA products. Rosenberger's actions are so blatant that it has even pitched CommScope's customers using materials that bear an internal CommScope acronym—CAPAC, where the first "C" is for "CommScope"—because they were generated using CommScope's trade secret software.

6.      Rosenberger is engaging in these activities with the unlawful aid of former CommScope employees. Over the past year, Rosenberger hired two former CommScope employees: (a) Defendant Janet Javier, who was CommScope's Key Account Manager for one of its biggest customers, T-Mobile, and (b) Robert Cameron, who was a CommScope Applications Engineer. Javier and Cameron are now soliciting T-Mobile on behalf of Rosenberger, and using confidential CommScope information for Rosenberger's benefit, and Javier is soliciting additional CommScope employees to work for Rosenberger, all in violation of their CommScope employment contracts.

7.      In short, Rosenberger is using stolen CommScope software to create and validate BSAs that are knockoffs of CommScope hardware, and selling them to CommScope's customers with the unlawful aid of former CommScope staff. The Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq., was designed to protect against exactly this type of misconduct—particularly where, as here, the perpetrator is a foreign actor that can easily evade detection by moving stolen information out of the country.

8.      CommScope brings this action to protect its intellectual property and contractual rights. Rosenberger should not be allowed to continue to benefit from its unlawful misappropriation of CommScope's trade secrets and confidential information, and Javier and Cameron should be required to abide by their contractual obligations to CommScope.

## THE PARTIES

9.      CommScope is a corporation organized under the laws of the state of Delaware, having its principal place of business at 1100 CommScope Place SE, Hickory, North Carolina.

10.     The Rosenberger Defendants are part of a multinational conglomerate. ███████
████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

11.     Rosenberger China is a subsidiary of Rosenberger Germany. It is a Chinese entity with its principal place of business in Kunshan, Jiangsu Province, China. It is majority owned by Rosenberger Asia.

12.     Rosenberger Asia is a Chinese entity with its principal place of business in Beijing, China. It is majority owned by Rosenberger Germany. It owns the Rosenberger Asia Office in New Jersey, which is Rosenberger Asia's only office in the United States.

13.     The Rosenberger Asia Office is a limited liability company organized under the laws of New Jersey, having its principal place of business at 69 King Street, Dover, New Jersey. It is a subsidiary of Rosenberger Asia. It is a research and development center that designs and develops BSAs.

14.     Rosenberger USA is a corporation organized under the laws of Texas, having its principal place of business at 1100 Professional, Suite 100, Plano, Texas. It is a subsidiary of Rosenberger Germany. Rosenberger's United States operations, including the Rosenberger USA Office in New Jersey and its offices in other states, are consolidated under Rosenberger USA.

15.     The Rosenberger USA Office is a corporation organized under the laws of New Jersey, having its principal place of business at 6970 Central Highway, Pennsauken, New Jersey 08109. It is a wholly owned subsidiary of Rosenberger USA. It is engaged in precision manufacturing, including the manufacturing of antennas and antenna elements. This is shown in materials available on Rosenberger's website, true and correct copies of which are attached as **Exhibits 8** and **9**.

16.     Rosenberger Site Solutions is a limited liability company organized under the laws of Delaware, having its principal place of business at 102 Dupont Drive, Lake Charles, Louisiana. It is 50% owned by Rosenberger USA. It operates a network of distribution centers which sell infringing BSAs and other Rosenberger products throughout the United States.

17.     Rosenberger Germany is a German entity having its principal place of business at Hauptstrasse 1, Fridolfing, Germany. Rosenberger Germany is the ultimate parent entity of the

other Rosenberger Defendants. The Rosenberger Defendants are private companies that are nonpublic entities.

18.     NWI is a corporation organized under the laws of New Jersey, having its principal place of business at 69 King Street, Dover, New Jersey, the same location as the Rosenberger New Jersey Office. NWI is a related entity to the other Rosenberger Defendants. ███████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ See, for example, three Rosenberger emails, true and correct copies of which are attached as **Exhibits 10-12**. In addition, the President of Rosenberger Asia, Aili Liu, is or was a director and registered agent of NWI, as shown in public records for NWI, a true and correct copy of which are attached as **Exhibit 13**.

19.     CellMax is an entity organized under the laws of Sweden, having its principal place of business at Gullfossgatan 1A & 1B, 164 40 Kista, Stockholm County, Sweden. CellMax is a subsidiary of Rosenberger Germany and is a part of the Rosenberger Group. CellMax's focus is antenna design and development. Rosenberger uses CellMax to sell BSAs on behalf of Rosenberger, including on behalf of Rosenberger Site Solutions and on behalf of the Rosenberger Asia Office, to wireless customers, like T-Mobile, in the United States.

20.     Janet Javier is an individual residing in Snoqualmie, Washington. Until August 3, 2018, Javier was an employee of CommScope. At the time of her departure, Javier was a Key Account Manager for CommScope's T-Mobile account.

21.     Robert Cameron is an individual residing in Carrollton, Texas. Until January 18, 2019, Cameron was an employee of CommScope. At the time of his departure, Cameron was an Applications Engineer.

## SUBJECT MATTER JURISDICTION

22.     This is a civil action for trade secret misappropriation arising under federal law in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA"); trade secret misappropriation in violation of the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 et seq.; and misappropriation of trade secrets, misappropriation of confidential information, breach of contract, breach of the fiduciary duty of loyalty, tortious interference with contract, and civil conspiracy under the common law of the State of New Jersey.

23.     The Court has federal-question jurisdiction because the DTSA claim arises under federal law and federal law creates a private cause of action. The Court has supplemental jurisdiction over the state-law claims because they are supplemental to the federal claim under 28 U.S.C. § 1367.

## PERSONAL JURISDICTION

24.     The Rosenberger Asia Office and the Rosenberger USA Office (together, the "Rosenberger New Jersey Offices") are organized under the laws of New Jersey and have their principal place of business in New Jersey. CommScope's claims arise out of their conduct in New Jersey, including their use of CommScope trade secrets in New Jersey. This Court has personal jurisdiction over the Rosenberger Asia Office. This Court has personal jurisdiction over the Rosenberger USA Office.

25.     Janet Javier and Robert Cameron violated their CommScope employment contracts in the course of their employment by the Rosenberger Asia Office, which is located in New Jersey. Further, Javier and Cameron both violated their CommScope employment contracts by soliciting CommScope customers in New Jersey. This Court has personal jurisdiction over Janet Javier. This Court has personal jurisdiction over Robert Cameron.

—7—

26.     Rosenberger Asia and Rosenberger USA own and exercise control over the Rosenberger Asia Office in New Jersey and the Rosenberger USA Office in New Jersey, respectively, and those New Jersey Offices are using the CommScope trade secrets at their direction. This Court has personal jurisdiction over Rosenberger Asia. This Court has personal jurisdiction over Rosenberger USA.

27.     The Rosenberger Defendants are engaged in an unlawful conspiracy to misappropriate CommScope's trade secrets and the Rosenberger New Jersey Offices, Javier, Cameron, and NWI have taken actions in furtherance of that conspiracy in New Jersey. This Court has personal jurisdiction over the Rosenberger Defendants.

28.     Rosenberger Site Solutions is engaged in an unlawful conspiracy to misappropriate CommScope's trade secrets and its co-conspirators the Rosenberger New Jersey Offices, Javier, Cameron, and NWI have taken actions in furtherance of that conspiracy in New Jersey. Rosenberger Site Solutions is registered to do business in New Jersey. This Court has personal jurisdiction over Rosenberger Site Solutions.

**29.**     The Rosenberger Defendants have failed to observe corporate formalities. For example, the Rosenberger Asia Office, Rosenberger Site Solutions, NWI, and CellMax have each handled aspects of the BSA sales process for the benefit of other Rosenberger Defendants. This is shown in **Exhibits 10-12** and in two additional Rosenberger emails, true and correct copies of which are attached as **Exhibits 14** and **15**. Similarly, the Rosenberger Defendants use common directors or officers to control the separate corporate defendants. True and correct copies of a page from Rosenberger Germany's website and three Rosenberger USA public filings are attached as **Exhibits 16-19**. Rosenberger Germany and Rosenberger USA use the

other Rosenberger Defendants to act as their agents in New Jersey. This Court has personal jurisdiction over the Rosenberger Defendants.

30.     The DTSA claim arises under federal law. Rosenberger China, Rosenberger Asia, and Rosenberger Germany are not subject to personal jurisdiction in any specific state and have sufficient contacts with the United States. *See* Fed. R. Civ. P. 4(k)(2). This Court has personal jurisdiction over Rosenberger China for the DTSA claim. This Court has personal jurisdiction over Rosenberger Asia for the DTSA claim. This Court has personal jurisdiction over Rosenberger Germany for the DTSA claim.

31.     The state law claims arise from a common nucleus of operative fact with the DTSA claim. This Court has personal jurisdiction over Rosenberger China for the state law claims. This Court has personal jurisdiction over Rosenberger Asia for the state law claims. This Court has personal jurisdiction over Rosenberger Germany for the state law claims.

32.     NWI is organized under the laws of New Jersey and has its principal place of business in New Jersey. CommScope's claims arise out of NWI's conduct in New Jersey. This Court has personal jurisdiction over NWI.

33.     CellMax sells BSAs to wireless customers in the United States. The BSAs that CellMax sells and ships are warehoused in New Jersey. This Court has personal jurisdiction over CellMax. In the alternative, CellMax is not subject to personal jurisdiction in any specific state and has sufficient contacts with the United States. *See* Fed. R. Civ. P. 4(k)(2). This Court has personal jurisdiction over CellMax for the DTSA claim. The state law claims arise from a common nucleus of operative fact with the DTSA claim. This Court has personal jurisdiction over CellMax for the state law claims.

**VENUE**

34.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the

events giving rise to CommScope's claims occurred in this district and under 28 U.S.C.

§ 1391(c)(3) because Rosenberger China, Rosenberger Asia, Rosenberger Germany, and

CellMax are not resident in the United States and may be sued in any district.

**FACTUAL BACKGROUND**

**I.     CommScope is a Global Leader in the Wireless Infrastructure Industry**

35.     CommScope is a leader in providing infrastructure for wireless networks.

CommScope has a strong reputation for its leading technologies and best-in-class performance.

Essential communications networks around the world run on its technology. CommScope

achieved its position as a market leader by investing in research and development, and by

investing in developing close, long-term relationships with its customers.

36.     CommScope offers a complete portfolio of wireless network infrastructure

products, including base station antennas ("BSAs"). A BSA is a complicated and valuable piece

of equipment often seen attached to cellular towers or on rooftops. For example, the following

are images of BSAs:

 

—10—

For scale, BSAs typically range from four to eight feet long.

37.     BSAs use radio frequencies to exchange signals with mobile devices like cell phones. They are technologically advanced devices that must be able to receive and transmit radio signals at great distance with minimal interference. Without BSAs, wireless networks, including networks across the United States, could not transmit the data sent over them every day.

### CommScope's Trade Secret Software

38.     Like CommScope's BSAs themselves, the processes CommScope uses to create them are also technologically sophisticated. During the antenna design, development, testing, validation, qualification, and marketing process, CommScope uses two trade secret software programs, called AAAP ("the Computational Software") and PSOAA ("the Simulation Software").

39.     The Computational Software is a sophisticated program for testing and evaluating antenna performance that is essential to CommScope's BSA design, development, testing, validation, qualification, and marketing processes. CommScope's predecessor Andrew Corp.[1] spent years painstakingly developing the Computational Software in house; in fact, its name, AAAP, is short for the "Andrew Antenna Analysis Program." The Computational Software analyzes an antenna's three-dimensional radiation patterns and performs complex calculations to evaluate its performance along a variety of metrics, such as directivity, beamwidth, and sidelobe. It then generates graphs—called "rectangular plots" and "polar plots." For example, rectangular

---

[1] As is discussed later, CommScope acquired Andrew Corp. in 2007.

plots show a BSA's key parameters (such as its two-dimensional patterns, gain, beamwidth, and

squint) calculated at each of its operating frequencies, while polar plots project a BSA's three-

dimensional performance onto many different two-dimensional planes. This screenshot shows

AAAP generating a rectangular plot based on data from a CommScope BSA:



40.     When designing BSAs, CommScope engineers use the Computational Software to

explore many permutations of components and identify the best-performing configurations. It is

a key ingredient and competitive differentiator in CommScope's antenna design workflow,

enabling it to create more effective designs more efficiently. And once a BSA is developed,

CommScope uses the Computational Software's plots in datasheets, customer presentations, and

marketing materials. CommScope also uses the Computational Software to generate reports,

which it shares with customers. The Computational Software's plots and reports give

CommScope and its customers a reliable way to assess an antenna's quality and fit for the

customers' needs. Customers would not buy BSAs without a way to reliably understand their performance along key metrics, such as is provided by the Computational Software.

41.     The Simulation Software is a complex modeling program that is also an important part of CommScope's BSA design and development process. Its name, PSOAA, is short for "Particle Swarm Optimization Antenna Analysis." The Simulation Software calculates the expected performance of a BSA design, optimizes it along any of a number of different variables (such as directivity, beamwidth, and sidelobe), and enables engineers to further fine-tune the design by tweaking its parameters (such as amplitude, phase, and arrangement of radiating elements) and checking their impact on performance. CommScope created it through a painstaking multi-year design process. CommScope uses the Simulation Software to create virtual mockups of antennas so that it can evaluate their performance before developing physical models, saving it development time and improving the quality of its products.

42.     CommScope developed several trade secret software programs which it uses alongside the Computational Software, including the Satimo Macro Generator, HFSS to AAF, CST to AAF, and AAAP Import Automation (collectively the "Support Software"). CommScope developed each of these programs in-house. Each of these programs is used to prepare a certain type of antenna data for use with AAAP. For example, the Satimo Macro Generator is designed to work with the Satimo line of antenna test ranges; HFSS to AAF works with the third-party program HFSS; CST to AAF works with the third-party program CST; and AAAP Import Automation uses the Computational Software to automatically convert antenna test range data into Andrew Antenna Format.

43.     In addition to these programs, CommScope uses a trade secret format for antenna pattern data called the Andrew Antenna Format. CommScope's predecessor Andrew Corp.

—13—

developed the Andrew Antenna Format in-house. CommScope uses the Andrew Antenna Format to standardize antenna pattern data from a wide range of sources so that it can be analyzed by CommScope's own trade secret software tools, including the Computational Software. The Computational Software creates files in Andrew Antenna Format. In addition, CommScope's Simulation Software creates files in Andrew Antenna Format for simulated antennas, rather than for physical antennas that have been tested at a test range.

**II.    CommScope Invested Substantial Time, Effort, And Money To Develop Its BSA Trade Secrets, And Has Taken Reasonable Steps To Protect Them**

44.    CommScope's BSAs are the result of years of concentrated research and development efforts. CommScope has expended a considerable amount of time and effort and large sums of money to develop confidential and trade secret information about its BSAs. CommScope's BSA Trade Secrets include information regarding the design of the devices themselves, as well as the methods and software programs (including the Computational Software, the Simulation Software, the Support Software, and the Andrew Antenna Format) used to create them.

45.    CommScope has developed and employed reasonable measures to protect the confidential nature of the information about the processes and products it has developed. These measures include, without limitation, securing its buildings via physical measures, such as by requiring key cards and limiting visitor access; storing confidential materials like the BSA design documentation and the source code for the Computational Software, the Simulation Software, and the Support Software on secure servers; requiring CommScope employees to sign a non-disclosure agreement upon joining the firm and to formally re-acknowledge their confidentiality obligations if and when they depart; and conducting an annual training on confidentiality.

—14—

46.     In addition, CommScope maintains the Computational Software, the Simulation Software, and the Support Software as proprietary and confidential and protects them from disclosure. CommScope (as well as its predecessor Andrew Corp.) developed each of these programs in-house and has not licensed them or otherwise made them available outside of the company.

### III.     Rosenberger's Misappropriation of CommScope's Trade Secrets

***Rosenberger Targets CommScope's Employees for Trade Secret Information***

47.     In the last few years, Rosenberger China has hired over a dozen CommScope employees who worked on CommScope's BSAs. The CommScope employees hired by Rosenberger include managers, supervisors, and the former lead R&D manager of the CommScope business unit with responsibility for BSAs. They include mechanical engineers— who had access to confidential information including design files and other engineering drawings for CommScope's BSA hardware—and radio frequency engineers, who had access to those materials as well as to CommScope's trade secret software programs, including the Computational Software, the Simulation Software, and the Support Software. As a result, Rosenberger China's BSA unit is now loaded with former CommScope employees, including in leadership roles. Former CommScope employees are also working for Rosenberger Site Solutions in leadership roles.

48.     Rosenberger enticed these employees away from CommScope by paying significantly above-market rates—sometimes as much as double current salaries. These above-market salaries reflect the premium Rosenberger places on employees' ability to bring over confidential CommScope information and the development costs Rosenberger can avoid by unfairly piggybacking off CommScope's research and development.

49.     Rosenberger uses these employees' knowledge of CommScope trade secrets, and the confidential information they were able to provide, to develop BSAs modeled on CommScope products. Rosenberger targets CommScope employees for hiring based on their access to confidential information about products it wants to develop and then uses that information to develop them faster than would be feasible if it were competing fairly.

50.     Confidential CommScope information routinely flows from Rosenberger China to Rosenberger's locations in the United States, particularly to the Rosenberger New Jersey Offices. Several former CommScope employees now working for Rosenberger regularly travel from Rosenberger China to the Rosenberger New Jersey Offices. They include CommScope's former Radio Frequency Team Lead, Sun "Michelle" Jing (also known as Janny Sun), who travels regularly between the two. While at CommScope, Jing had access to CommScope's trade secret Computational Software, Simulation Software, and Support Software, as well as confidential CommScope information such as the design files for its BSAs.

51.     These employees act as conduits through which CommScope's BSA Trade Secrets flow between the United States and China.

52.     Rosenberger China is also using former CommScope employees in China to develop BSAs for sale in the United States.

53.     Confidential CommScope information also flows from Rosenberger to NWI. NWI employees overlap with Rosenberger employees. For example, the President of Rosenberger Asia, Aili Liu, is or was a director and registered agent of NWI, as shown in **Exhibit 13**, and Sun Jing also works for both companies. ████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

***Rosenberger's Misappropriation of CommScope's Trade Secret Software***

54.     Rosenberger obtained copies of CommScope's trade secret Computational Software, Simulation Software, and Support Software from former CommScope employees and is using those programs to develop and sell BSAs in competition with CommScope.

55.     Rosenberger has CommScope's trade secret software programs, including but not limited to the Computational Software (AAAP), the Simulation Software (PSOAA), and related programs.

56.     Rosenberger has copies of CommScope's trade secret software program the Computational Software, AAAP.

57.     Rosenberger has copies of CommScope's trade secret software program the Simulation Software, PSOAA.

58.     Rosenberger has copies of CommScope's trade secret software program the Satimo Macro Generator.

59.     Rosenberger has copies of CommScope's trade secret software program HFSS to AAF.

60.     Rosenberger has copies of CommScope's trade secret software program CST to AAF.

61.     Rosenberger has copies of CommScope's trade secret software program AAAP Import Automation.

62.     Rosenberger has confidential information related to CommScope's trade secret software programs, including but not limited to source code, for the Computational Software, the

Simulation Software, the Support Software, and Antenna Pattern Viewer (a program whose executable file CommScope makes publicly available, while protecting information such as its source code as trade secret).

63.    Rosenberger has files in CommScope's trade secret Andrew Antenna Format.

64.    Rosenberger uses CommScope's trade secret software program the Computational Software, AAAP, to design, develop, test, validate, qualify, and market BSAs.

65.    Rosenberger uses CommScope's trade secret software program the Simulation Software, PSOAA, to design, develop, test, validate, qualify, and market BSAs.

66.    Rosenberger uses CommScope's trade secret software program the Satimo Macro Generator to design, develop, test, validate, qualify, and market BSAs.

67.    Rosenberger uses CommScope's trade secret software program HFSS to AAF to design, develop, test, validate, qualify, and market BSAs.

68.    Rosenberger uses CommScope's trade secret software program CST to AAF to design, develop, test, validate, qualify, and market BSAs.

69.    Rosenberger uses CommScope's trade secret software program AAAP Import Automation to design, develop, test, validate, qualify, and market BSAs.

70.    Rosenberger uses files in CommScope's trade secret Andrew Antenna Format to design, develop, test, validate, qualify, and market BSAs.

71.    Rosenberger has used CommScope's trade secret software to design, develop, test, validate, qualify, and market Rosenberger's BSAs, BSAs which compete with CommScope's BSAs. Rosenberger is marketing and selling, or attempting to market and sell, these Rosenberger BSAs, which are the product of misappropriation, to CommScope's customers in the United States. ███████████████████████

—18—



72.   **The Trade Secret Computational Software.** Rosenberger is using CommScope's trade secret Computational Software to validate and sell Rosenberger BSAs to CommScope's customers.

73.   Rosenberger has created and distributed a presentation containing plots that appear identical to CommScope's plots. Rosenberger created the plots in this presentation using a misappropriated copy of the Computational Software.

74.   In addition, as part of an effort by Rosenberger to sell BSAs to Sprint, Rosenberger sent Sprint a presentation containing plots that look exactly like CommScope's plots.

75.   The Rosenberger presentation to Sprint includes compelling evidence that Rosenberger is using a stolen copy of the Computational Software. Indeed, as reflected in the red box below, the legends in the Rosenberger presentation use an internal CommScope acronym—CAPAC, which is short for "CommScope Antenna Performance Assurance Center":

# REDACTED

76.     The plots in the Rosenberger presentation to Sprint are indistinguishable from the plots created by CommScope's Computational Software. For example, the Computational Software labels each line in its plots using a fixed set of colors and shapes that is hard-coded into the software, so that each graph it creates uses the same colors and shapes in the same order. The Rosenberger plots label each line using those same colors and shapes, in the same order, as this comparison shows[2]:

---

[2] The symbols' different blurriness levels is due to the source images' different resolutions.

| CommScope | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rosenberger | | | | | | | | | | | | |

The Rosenberger plots also use the same scale and formatting on the X and Y axes, and the same format for labels on the legend, as the Computational Software. For example, the legend on the left is from the Computational Software, while the one on the right is from the Rosenberger presentation to Sprint:



The labels in the legends describe the data shown; for example, in the top Rosenberger entry, "HB" is for "high band," "P1" refers to the antenna's first port, "+45" indicates the antenna's polarization, "T0" indicates its tilt—and CAPAC is CommScope's acronym.

77.    For comparison, the first plot shown below was created with CommScope's Computational Software, and the plot on the bottom is from Rosenberger's presentation to Sprint:



# REDACTED

78.     The first plot below was created with CommScope's Computational Software, while the bottom plot is from another Rosenberger presentation, a true and correct copy of which is attached as **Exhibit 22**:



# REDACTED

79.     And again, the first plot below was created with CommScope's Computational

Software, while the bottom plot is from the same Rosenberger presentation. This pair of plots

appears different than the prior examples because they are rectangular pattern plots, while the

prior examples are rectangular plots of key performance indicators:

—23—



# REDACTED

80.     The similarity in formatting is not a coincidence. The acronym "CAPAC" is unique to CommScope, and the Computational Software's choice of colors and label shapes is both arbitrary and baked into its source code.

81.     In addition to Sprint, Rosenberger has also used the stolen Computational Software to prepare plots for BSA marketing materials it sent to T-Mobile, a key CommScope customer.

82.     As is described in more detail below, Javier and Cameron are former CommScope employees who are now soliciting T-Mobile's BSA business for Rosenberger. Javier coordinated an effort to pitch T-Mobile on Rosenberger's BSAs with the help of Cameron and another former CommScope employee named Pamela Gallagher. As part of the pitch, Gallagher sent T-Mobile a specification sheet for the Rosenberger BSA. A true and correct copy of the email and specification sheet are attached as **Exhibit 23**.

83.     The BSA specification sheet that Rosenberger sent T-Mobile was created using a stolen copy of CommScope's Computational Software. The specification sheet includes polar plots whose format is indistinguishable from the plots created by CommScope's Computational Software. A polar plot generated by the CommScope Computational Software is on the left and a Rosenberger plot from the specification sheet it sent to T-Mobile is on the right:



REDACTED

COMMSCOPE®                    **Rosenberger**

84.     The similarity in formatting is not a coincidence. The format of the Rosenberger polar plot exactly matches the 17 values that set the format of polar plots created by the Computational Software, all of which are fixed in its source code. Those 17 variables are shown below:



❶ **Angular Labels** – Font: Arial, Color: clBlack, Pen Style: psSolid, Position: Center, Range: -170 to 180, Steps: 10deg
❷ **Radial Labels** – Font: Arial, Color: clBlack, Pen Style: psSolid, Position: Center, Steps: 10deg
❸ **Label Height** – Polar Graph Radius x 0.065
❹ **Angular Label Radius** – Polar Graph Radius + 1.2 x Label Height
❺ **Gridline** – Color: clSilver, Pen Style: psSolid
❻ **Border** – Color: clGray, Pen Style: psSolid

—26—

85.     In addition to these specification sheets, it is likely that Rosenberger used the software to prepare other materials for T-Mobile. Rosenberger has conducted at least two field trials of its BSAs with T-Mobile. Wireless service providers typically require antennas to be approved for conducting field trials, and also typically require information about the antenna's performance along key metrics before approval. Rosenberger likely met those requirements by giving T-Mobile plots prepared with the Computational Software.

86.     In addition to Sprint and T-Mobile, Rosenberger has also likely prepared plots for AT&T—also a CommScope customer—using a misappropriated copy of the Computational Software.

87.     Rosenberger has obtained AT&T's approval to sell certain BSAs to AT&T, which CommScope knows because a third-party company that supplies BSAs to AT&T sent CommScope a list of Rosenberger BSAs approved at AT&T. A true and correct copy of the list is attached as **Exhibit 24**. Rosenberger created the specification sheets for some of those BSAs using a stolen copy of CommScope's Computational Software. Like the specification sheet Rosenberger sent T-Mobile, the specification sheets for some of the AT&T-approved BSAs include polar plots whose format is indistinguishable from the plots created by CommScope's Computational Software. A true and correct copy of an example of one of the specification sheets is attached as **Exhibit 25**. A polar plot generated by the CommScope Computational Software is on the left and a Rosenberger plot from the specification sheet for an AT&T-approved BSA is on the right:



REDACTED

This specification sheet was included with an antenna sold by Rosenberger Site Solutions.

88.    In addition, AT&T typically does not approve antennas without first receiving a package of plots, such as the Computational Software creates, validating the antenna's performance along key metrics. Rosenberger likely prepared those plots for AT&T using the stolen Computational Software.

89.    ███████████████████████████████

████████████████████████████████

██████████████████████████████████

██

90.    ████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

—28—

91.

COMMSCOPE®

# REDACTED

Rosenberger

# REDACTED

92.

COMMSCOPE®

REDACTED

Rosenberger

REDACTED

93. 

95.     In the course of using the Computational Software as described above, Rosenberger likely used the Support Software to prepare data for input to the Computational Software. Rosenberger likely also generated files in the Andrew Antenna Format.

96.     **The Trade Secret Simulation Software.** Rosenberger is also using CommScope's trade secret Simulation Software to develop BSAs.

97.     CommScope learned of Rosenberger's misappropriation of the Simulation Software from a Rosenberger employee. A Rosenberger China employee interviewed for a vacant role with CommScope. At the interview, a CommScope hiring manager asked a routine question about ways to simulate antenna patterns for optimal design. The Rosenberger employee responded that he did his day-to-day simulation work using "PSOAA," the Simulation Software—a CommScope proprietary program that only CommScope's employees can access. Rosenberger China obtained a copy of the Simulation Software from a departing CommScope employee and uses it to design, develop, test, validate, qualify, and market antennas.

98.     Rosenberger employees in the United States also use the Simulation Software in their BSA-related work, including at the Rosenberger New Jersey Offices.

### *Rosenberger's Misappropriation of CommScope's Trade Secret Hardware*

99.     CommScope lawfully acquired a Rosenberger BSA from a third-party distributor.

100.    The Rosenberger BSA is strikingly similar to CommScope's own designs.

To illustrate the point, here is an image of a CommScope EGZV5 BSA:



Compared to an image of a Rosenberger BA-A7C7 J85W 8X65V-01 BSA[3]:



101.    CommScope lawfully acquired several additional Rosenberger BSAs from a third party, at least one of which was in turn acquired from Rosenberger Site Solutions. These Rosenberger BSAs are approved for sale to AT&T, a CommScope customer. CommScope's analyses of these Rosenberger BSAs revealed striking similarities to the hardware utilized in CommScope's BSAs. For example, the following Rosenberger BSA is strikingly similar to CommScope's BSAs.

---

[3] One X-shaped element on this BSA has been removed.

Here is the CommScope BSA:



And here is the Rosenberger BSA:



102.    The similarities between Rosenberger's BSA hardware and CommScope's BSA hardware are not coincidental and are not the result of independent development by Rosenberger. Indeed, several components of Rosenberger's BSAs are exact replicas of the same components in CommScope's BSAs, including various non-functional aspects of those components.

103.    In short, these Rosenberger BSAs are knockoffs of CommScope BSAs. And Rosenberger made them using CommScope's confidential and trade secret information, which was provided by former CommScope employees.

104.    CommScope maintains as trade secret the mechanical design files and printed circuit board ("PCB") files for its BSAs. Based on similarities between components found in CommScope's and Rosenberger's BSAs and the information to which the Individual Defendants or other former CommScope employees who are now employed by Rosenberger had access, CommScope alleges that Defendants misappropriated CommScope's PCB files, mechanical design files, and related documentation associated with various trade-secret hardware components or compilations of components, as well as BSA models containing those components.

—33—

██ Indeed, CommScope has uncovered direct evidence showing that former CommScope employees have used and disclosed drawings relating to CommScope's BSAs. For example.

REDACTED

***Rosenberger's Misappropriation of CommScope's Trade Secret Business Information***

106.    In addition, CommScope alleges that Defendants have misappropriated its trade secret design guidelines and work instructions relating to its design, development, and manufacturing of BSAs; its trade secret training materials relating to its design, development,

and manufacturing of BSAs; trade secret information pertaining to CommScope's customers and

potential customers; trade secret financial and other strategic information; trade secret product

roadmaps; trade secret marketing information; trade secret information pertaining to

CommScope's vendors and suppliers; and trade secret information relating to CommScope's

research and development efforts.

### *Rosenberger USA, the Rosenberger USA Office, Rosenberger Germany, NWI, and CellMax's Involvement in Rosenberger's Misappropriation of CommScope's Trade Secrets*

107.    As described above, the Rosenberger Defendants are a multinational

conglomerate that go to market collectively.

108.    The entire Rosenberger Group is involved in taking Rosenberger's BSAs to

market in the United States. These efforts include the design, development, testing, validation,

qualification, manufacturing, and marketing of BSAs that incorporate CommScope's trade

secrets in the United States, as well as the design, development, testing, validation, qualification,

and marketing of BSAs in the United States using CommScope's trade secret software. They

also include using materials prepared with CommScope's Computational Software to sell BSAs.

109.    The Rosenberger USA Office is involved in Rosenberger's manufacturing and

sale of infringing BSA antennas in the United States. Rosenberger's website states that the

Rosenberger USA Office manufactures "antennas" and "antenna elements." **Exhibits 8**, **9**.

Rosenberger's website also states that the Rosenberger USA office manufactures radio frequency

products including "Diplexers, Filtered Feed Horns, Loads, Terminations, Beam Forming

Networks, Center Conductors, Power Dividers, Phase Shifters, Couplers, Shims, Bends, Filters,

Antennas, Phased Arrays, Passive Arrays, [and] Test Fixtures." **Exhibit 8**.

110.    Rosenberger USA is involved in Rosenberger's manufacturing and sale of

infringing BSA antennas in the United States. Rosenberger's United States offices in

Pennsauken, New Jersey and elsewhere are Rosenberger USA's subsidiaries. A page on Rosenberger's website, a true and correct copy of attached as **Exhibit 29**, explains that Rosenberger's North American operations are consolidated under "Rosenberger North America," which appears to be Rosenberger USA. A Rosenberger North America brochure available on the Rosenberger website notes Rosenberger North America's role in manufacturing antenna components through its Rosenberger USA Office. **Exhibit 9**.

111.    Rosenberger Germany is involved in Rosenberger's design, development, manufacturing, and marketing of infringing BSA antennas in the United States. ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

# REDACTED

112.     ████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

113.     Specification sheets for Rosenberger BSAs sold or approved for sale in the United

States include Rosenberger Germany's name and address. ████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ The specification sheet for the BSA used in a trial Rosenberger

did for T-Mobile in New York, described in more detail below, also includes the names of both

Rosenberger Germany and Rosenberger Asia.

114.    In addition, the Rosenberger North America brochure available on Rosenberger's

website that describes Rosenberger North America's role in manufacturing antenna components

also provides contact information for Rosenberger Germany.

115.    ████████████████████████████████████████████

██████████████████████████

116.    ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

### IV.    The Individual Defendants' Breach of their Agreements with CommScope

#### *The Individual Defendants' Employment with CommScope*

117.    Javier joined Andrew Corp. in 2007. Andrew Corp. was a telecommunications

company specializing in wireless equipment, which CommScope acquired later that year. Javier

became a CommScope employee through the acquisition.

118.    On May 14, 2007, as a condition of employment with Andrew Corp., Javier

entered into an Employee's Confidentiality, Invention Assignment, and Non-Compete

Agreement with Andrew Corp. (the "Andrew Corp. Employment Agreement"), a true and

correct copy of which is attached as **Exhibit 1**. This Agreement obligated Javier not to solicit

certain Andrew Corp. employees and customers for a year after her employment ended:

G. Company Customers. Employee agrees that for twelve (12) months following termination of Employee's employment for any reason, Employee will not, directly or indirectly, solicit, call upon, contract with, sell to, or service, with respect to Conflicting Products any Company customer which Employee, directly or indirectly, solicited, called upon, contracted with, sold to, or serviced during his last twelve (12) months of employment by the Company. . . .

I. Definition of Conflicting Products. "Conflicting Products" means products, processes, or services which are similar to, compete with, or can be used for the same purposes as products, processes or services sold or offered to be sold by, or in development at the Company, at any time during Employee's employment at the Company.

J. Non-solicitation of the Company's Employees. During Employee's employment and for twelve (12) months following the termination of Employee's employment for any reason, Employee agrees that he will not, for himself or for any third-party, employ or seek to employ any person who is then employed by the Company. During this same period, Employee will not induce or attempt to influence any Company employee to terminate his or her employment or association with the Company.

K. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

119.    The Andrew Corp. Employment Agreement recognized that Javier would acquire

confidential information through her work for Andrew Corp., prohibited her disclosure of that

information, and required its return upon her departure:

1. Understandings. . . . C. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; customer and potential customer specifications; supplier information; and information about product design, research, development and capabilities. Some of this information is highly secret, is not generally known outside of the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Confidential information may take the form of documents, be stored or transmitted electronically, or exist in spoken words only; what matters is the information itself, not the way in which it is stored or conveyed. . . . .

2. Employee's Obligations. A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by

Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee agrees to return to the Company at the time of the termination of his employment, all Company property in his possession, custody, or control, including but not limited to, all Confidential Information of the Company which exists in tangible form.

120.     The Andrew Corp. Employment Agreement further provided that it was "assignable by the Company [i.e., Andrew Corp., including its affiliates] without Employee's consent."

121.     CommScope's acquisition of Andrew Corp. closed on December 27, 2007. Andrew Corp. became a wholly-owned subsidiary of CommScope, giving CommScope the ability to enforce Andrew Corp.'s employment contracts.

122.     On November 2, 2010, Javier entered into an Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement with CommScope (the "CommScope Employment Agreement"), a true and correct copy of which is attached as **Exhibit 2**. Around the same time, she was promoted into a new position as a Product Line Manager, a role that gave her a new title, new responsibilities, and accountability for one of CommScope's key customer relationships.

123.     This Agreement included a similar prohibition on the solicitation of certain customers and employees:

3. Non-Solicitation. Employee agrees that during his or her employment by the Company and for a period of one (1) year subsequent to the end of his or her employment relationship with the Company, regardless of reason for termination or separation or who initiates the ending of such employment relationship, Employee will not, without the prior written consent of the Company, either directly or indirectly:

A. contact, solicit, divert, attempt to solicit, attempt to contact or attempt to divert business from any Customer for or on behalf of a Competitor (as defined below);

B. solicit, divert, attempt to solicit or attempt to divert the employment of any other individual who is or has been an employee of the Company at any time

—40—

within a period of twelve (12) months prior to the date of the end of his or her employment relationship with the Company;

C. For the purposes of this Paragraph 3, "Competitor" shall mean any person, business or other entity that (i) provides services or products that do or can compete with or displace any service or products sold or being developed for sale by the Company during Employee's employment with the Company; or (ii) engages in any other business activities so similar in nature or purpose to those of the Company that they may or do displace business opportunities or customers of the Company; and

D. For the purposes of this Paragraph 3, "Customer" shall be limited to any customer of the Company that Employee personally solicited, serviced, had management responsibilities for, or had substantive contact with on behalf of the Company during the last twelve (12) months of his or her employment with the Company.

124. The CommScope Employment Agreement recognized that Javier "may, during the course of [her] employment with the Company, be given access to Confidential Information," and that "it would be improper and inequitable for [Javier] to use Confidential Information for any purpose other than to benefit the Company or to disclose such Confidential Information to anyone outside of the Company, either during or subsequent to [her] employment with the Company, without the Company's approval."

125. Accordingly, the CommScope Employment Agreement, like the Andrew Employment Agreement, prohibited her disclosure of confidential information and required its return upon her departure:

1. Confidentiality. As part of Employee's employment, the Employee may be provided, become aware of or develop information that is proprietary and/or confidential, including, but not limited to: customer and potential customer information; sales, marketing and business plans; research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing, profit and cost information; customer and potential customer specifications; supplier information; Inventions (as defined above); and information about product design, research, development and capabilities. Some of this information is highly secret, is not generally known outside of the Company, is valuable because of its secrecy and constitutes trade secrets under applicable law. The types of information identified in this paragraph belong to the Company and are referred to in this Agreement as "Confidential Information."

—41—

Confidential Information may take the form of documents, be stored or transmitted electronically or exist in spoken words only.

A. Both during Employee's employment relationship with the Company and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company, or to a Company Officer, or to a third party if approved in writing prior to such use or disclosure by an authorized Officer of the Company.

B. Employee agrees to return to the Company at the end of his or her employment relationship with the Company, all Company property in his or her possession, custody or control. including, but not limited to, all Confidential Information that exists in tangible or electronic form. Employee also agrees that upon the end of his or her employment relationship with the Company or in anticipation of or subsequent to such separation, he or she will not delete, move offsite or destroy any Company property, regardless of form without the express consent of the Company. . . .

D. Upon request by the Company, Employee shall promptly provide to, and hereby agrees to allow the Company to inspect, his or her personal computer(s), hard drive(s) and/or other electronic storage medium or equipment upon which he or she has stored or transmitted Confidential Information in order to confirm that all Confidential Information has been removed or electronically destroyed. In the event that all of the Confidential Information has not been destroyed, Employee agrees that the Company is authorized to erase, destroy or remove such Confidential Information, or retain possession of the personal computer(s), electronic storage medium or equipment (other than the Employee's personal files and programs) and provide Employee with a substitutes [sic] of substantially the same value, without further payment or authorization and regardless of where the computer(s), electronic storage medium or equipment is located. . . .

F. The obligations set forth in this Paragraph shall be without time or geographic limitation and shall survive and be enforceable after Employee's employment relationship with the Company ends so long as the information in question continues to be Confidential Information. Confidential Information will no longer be considered confidential after a date on which the Employee can substantiate, as established by independent documentary proof, that the subject information: (a) has become publicly known through no wrongful act of the Employee, or (b) is approved for release or disclosure by prior written authorization of an authorized Officer of the Company. In the alternative, and only in the event a court of competent jurisdiction determines that this provision must contain a time limitation in order to be enforceable, the applicable time limitation shall be four (4) years from the Employee's last day of employment with the Company.

126.     Javier resigned from CommScope on August 3, 2018. At the time of her resignation, she was CommScope's Key Account Manager for T-Mobile, one of CommScope's most significant customers, and had been in that role since at least 2015.

127.     In her role as a CommScope Key Account Manager for T-Mobile, Javier met with T-Mobile frequently, often on a weekly basis, with the goal of selling T-Mobile CommScope products including BSAs. Javier had primary responsibility for field sales support to T-Mobile. As a result, she worked with T-Mobile staff across the United States. She also had significant responsibility for obtaining T-Mobile's approval of new CommScope products. For example, she facilitated T-Mobile field tests of new products and gave T-Mobile presentations about new CommScope technologies. In the course of her work for CommScope, Javier benefitted from CommScope's existing relationships with T-Mobile and acquired numerous relationships across T-Mobile's organization.

128.     Javier reaffirmed the Agreement in her exit paperwork. She signed an Employee Exit Statement, a true and correct copy of which is attached as **Exhibit 3**. In the exit statement, she acknowledged that she had been given a copy of her CommScope Employment Agreement and agreed that she understood that her confidentiality obligations continued after her termination.

129.     Cameron joined Andrew in 1999, where he had obligations of confidentiality. On November 9, 2010, Cameron agreed to a CommScope Employment Agreement, a true and correct copy of which is attached as **Exhibit 4**. His agreement has identical terms to Javier's agreement.

130.     Cameron departed from CommScope on January 18, 2019. At the time of his departure and for at least the preceding five years, he was an Applications Engineer.

131.    In his role as a CommScope Applications Engineer, Cameron interacted with CommScope's U.S. customers including AT&T, Verizon, T-Mobile, and Sprint. Cameron provided technical expertise during the sales process. He also provided field support to a wide range of CommScope customers, including T-Mobile, when they had technical issues. Cameron's role also required him to meet with key customers, including T-Mobile, for roadmap and/or product discussions, with the overall goal of enhancing the customer's perception of CommScope. Cameron's role was customer-facing and required spending a significant amount of time interacting with customers and providing guidance on how to use CommScope's products effectively. For example, in the year before his separation from CommScope Cameron answered technical questions from T-Mobile about CommScope antenna products; provided support to T-Mobile on issues regarding the performance of CommScope antennas; and prepared and sent materials to T-Mobile.

132.    Upon his separation, Cameron signed a Separation and Release Agreement, a true and correct copy of which is attached as **Exhibit 5**. In that Agreement, he recognized that he'd had access to confidential CommScope information and agreed not to disclose it without written authorization from CommScope:

> You acknowledge that as a result of your employment with Company, you have had access to confidential and proprietary business information of Company, including, but not limited to, insured claims and other insurance matters, personnel information, product information, vendor and supplier information, business decisions, plans and strategies, research and development activities, manufacturing and marketing techniques, technological and engineering data, processes and inventions, legal matters affecting Company and Company's business, customer and prospective customer information, trade secrets, bid prices, contractual terms and arrangements, prospective business transactions, joint ventures, pricing strategies, and financial and business forecasts ("Confidential Information"). Confidential Information also includes information, knowledge or data of any third party doing business with Company that the third party has identified as being confidential. You agree not to use or to disclose to anyone any Confidential Information at any time in the future without the prior written authorization of Company.

*Javier and Cameron Solicit T-Mobile's Antenna Business for Rosenberger*

133.    Javier and Cameron now work for Rosenberger. Specifically, Javier and Cameron are employed by the Rosenberger Asia Office, which is located in New Jersey. ███████

████████████████████████████████████████████████████

█████████████████████████████████████████

134.    Javier and Cameron are both working to sell BSAs to T-Mobile in violation of their legal obligations to CommScope.

135.    Cameron's work for Rosenberger includes work related to T-Mobile. ████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

136.    In April 2019, Javier and Cameron worked with T-Mobile to coordinate a field trial of a Rosenberger BSA at 148 Madison Street, New York, New York. In this trial, Rosenberger and T-Mobile deployed a Rosenberger BSA into T-Mobile's wireless network, where it provided a signal to T-Mobile customers in New York City. At Javier's direction, T-Mobile picked up the Rosenberger BSAs it used for the trial from the Rosenberger Asia Office in New Jersey. In addition, the T-Mobile staff with whom Javier and Cameron worked on the trial were based out of T-Mobile's corporate offices in Parsippany, New Jersey. True and correct copies of emails related to this trial are attached as **Exhibit 23** and **Exhibits 35-37**.

137.    Coordinating field trials for T-Mobile was a key part of Javier's responsibilities while she was at CommScope. Javier is now performing these same tasks for Rosenberger, and working with many of the same T-Mobile employees that she worked with while at

—45—

CommScope. Javier was T-Mobile's primary point of contact at Rosenberger for the trial. She

sent four Rosenberger BSAs, unit number 2F4WC-21, to New Jersey for the trial, where T-

Mobile received them from the Rosenberger Asia Office at Javier's suggestion. She also

arranged for Rosenberger engineer Pamela Gallagher—another former CommScope employee

who worked on field trials while at CommScope—to be on-site the day of the trial. Gallagher

sent T-Mobile specifications for the Rosenberger BSA in the lead-up to the trial. As is described

above, the specifications included polar plots that were created using Rosenberger's stolen

version of CommScope's Computational Software.

138.    Cameron was also involved in Rosenberger's pitch to T-Mobile. Gallagher

included both Javier and Cameron when she sent T-Mobile the specifications for the antenna.

Javier also added Cameron to discussions of logistics for the trial, including the conversation

where she sent T-Mobile to New Jersey to pick up the BSAs. As a former CommScope engineer,

Cameron was involved in the technical aspects of the trial for T-Mobile.

139.    In the same timeframe, Javier set up a trial of the same antenna for T-Mobile in

Los Angeles. █████████ and Gallagher also assisted with that trial.

140.    CommScope learned of Javier's work on the T-Mobile antenna trial when T-

Mobile employees working on the trial emailed Javier's CommScope email address—an

understandable action, since she had until recently been pitching those same T-Mobile

employees on CommScope's behalf.

### *Javier Solicits CommScope Employees*

141.    Additionally, Javier is actively soliciting CommScope employees for employment

with Rosenberger. In July 2019, Javier invited a current CommScope employee to meet her in

New Jersey to discuss an opportunity—shortly after a Rosenberger recruiter reached out to that

same employee. Javier approached CommScope employee Ray Butler about joining Rosenberger in or around June 2019. And in late 2018 she approached another CommScope executive involved in working with T-Mobile.

### *Javier and Cameron Violate their Non-Disclosure Agreements*

142.    As part of her work for CommScope, Javier had access to CommScope confidential information including, but not limited to, CommScope's sales, marketing and business plans; customer and potential customer information; information on customer and potential customer buying habits and preferences; customer and potential customer specifications; pricing information; and information about product design, research, development and capabilities, including CommScope's planned technical roadmaps for new product development, technical specifications for products CommScope has not yet released, and confidential technical information regarding the design and functioning of its BSA products. Javier also had access to an extensive network of customer contacts and relationships built by CommScope employees over the course of years. She is now using the confidential information and relationships she gained while at CommScope to benefit Rosenberger and has shared confidential CommScope information with Rosenberger.

143.    As part of his work for CommScope, Cameron had access to CommScope confidential information including, but not limited to, customer information; information on customer buying habits and preferences; customer specifications; cost information; and information about product design, research, development and capabilities, including CommScope's planned technical roadmaps for new product development, technical specifications for products CommScope has not yet released, and confidential technical information regarding the design and functioning of CommScope's BSA products. In addition,

—47—

Cameron had access to at least CommScope's Computational Software. He is now using the confidential information he gained while at CommScope to benefit Rosenberger and has shared confidential CommScope information with Rosenberger.

### *Javier and Cameron Use CommScope Trade Secrets for Rosenberger's Benefit*

144.    Javier and Cameron are aiding the Rosenberger Asia Office and the related Rosenberger entities in selling knockoffs of CommScope's BSAs.

145.    Javier and Cameron are selling BSAs that were designed, developed, tested, validated, qualified, or marketed with the use of CommScope's trade secret software, including the Computational Software, the Simulation Software, and the Support Software.

146.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████:

# REDACTED

***Rosenberger's Knowledge of Javier and Cameron's Employment Agreements***

147.    Through its previous hiring or attempts to hire several other CommScope employees, Rosenberger has knowledge or should have knowledge of the employment agreements that CommScope requires its employees to sign and the promises contained therein. ███████████████████████████████████████████████████ ████████████████████████████████████████████.

148.    Rosenberger nevertheless recruited and hired Javier and Cameron, despite knowing that their employment by Rosenberger in a role that involved soliciting T-Mobile would breach their post-employment obligations to CommScope. Rosenberger also permitted Javier to solicit current CommScope employees.

149.    Javier has knowledge or should have knowledge of the terms of CommScope's employment agreements with Cameron because she herself is subject to the same terms. She

nevertheless involved Cameron in soliciting T-Mobile, despite knowing that it would breach his post-employment obligations to CommScope.

150.    Rosenberger Asia, the Rosenberger Asia Office, Rosenberger China, and Rosenberger Germany are involved in Javier and Cameron's efforts to sell Rosenberger BSAs in the United States.

151.    While both Javier and Cameron work in the United States selling to companies in the United States, their employer Rosenberger Asia Office is a subsidiary of Rosenberger Asia, and they both use Rosenberger Asia email addresses. Additionally, the specifications for the T-Mobile antenna used in the New York trial for T-Mobile—which appear to have been created with CommScope's Computational Software—include the names of both Rosenberger Germany and Rosenberger Asia.

152.    Rosenberger Site Solutions, NWI, and CellMax are also involved in Javier and Cameron's efforts to sell BSAs to T-Mobile. ███████████████████

███████████████████████████████████████████████

████████████  **Exhibit 10**.

# COUNT I
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836(b)
### (Against All Defendants)

153.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

154.    CommScope possesses confidential information and trade secrets related to its BSA business including, but not limited to, the BSA Trade Secrets.

155.    Defendants have acquired and have used or are planning to use CommScope's BSA Trade Secrets under circumstances in which they knew or had reason to know that the BSA Trade Secrets were obtained without authorization.

156.    The Rosenberger Defendants have obtained CommScope's BSA Trade Secrets by, among other things, hiring CommScope employees on the understanding they would misappropriate CommScope BSA Trade Secrets without CommScope's authorization and provide the BSA Trade Secrets to the Rosenberger Defendants.

157.    The Individual Defendants have obtained CommScope's BSA Trade Secrets and are now using materials created with the BSA Trade Secrets to sell Rosenberger BSAs.

158.    CommScope's BSA Trade Secrets are related to products or services used in, or intended for use in, interstate or foreign commerce.

159.    CommScope has taken reasonable steps to maintain the confidential nature of its BSA Trade Secrets, including but not limited to the BSA Trade Secrets that the Rosenberger Defendants have misappropriated.

160.    CommScope's BSA Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

161.    CommScope's BSA Trade Secrets derive actual and potential independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

162.    Defendants possess CommScope's BSA Trade Secrets without any color of right.

163.    Defendants' actions in misappropriating CommScope's BSA Trade Secrets were done willfully and maliciously.

164.    Defendants' actions violate the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836 et seq.

165.    Defendants' misappropriation of CommScope's BSA Trade Secrets has caused and will cause CommScope damages in an amount to be determined at trial.

166.    In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to prevent the value of CommScope's BSA Trade Secrets from continuing to inure unfairly to Defendants' benefit.

**COUNT II**
**VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT,**
**N.J.S.A. §§ 56:15-1 et seq.**
**(Against All Defendants)**

167.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

168.    CommScope possesses BSA Trade Secrets related to its BSA business, as described above. CommScope's BSA Trade Secrets constitute trade secrets within the meaning of the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 et seq.

169.    Defendants have acquired and have used or are planning to use CommScope's BSA Trade Secrets under circumstances in which they knew or had reason to know that the BSA Trade Secrets were obtained without express or implied authority or consent and were not obtained by proper means.

170.    CommScope has taken reasonable steps to maintain the confidential nature of its Trade Secrets, including but not limited to the BSA Trade Secrets that Defendants have misappropriated and/or will misappropriate.

171.     CommScope's BSA Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

172.     CommScope's BSA Trade Secrets derive actual and potential independent commercial value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

173.     Defendants' actions in misappropriating CommScope's BSA Trade Secrets were done willfully and maliciously.

174.     Defendants' actions violate the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 et seq.

175.     Defendants' misappropriation of CommScope's BSA Trade Secrets has caused and will cause CommScope damages in an amount to be determined at trial.

176.     In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to eliminate the commercial advantage that Defendants would otherwise derive from the misappropriation.

### COUNT III
### MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

177.     CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

178.     CommScope possesses BSA Trade Secrets related to its BSA business, as described above. CommScope's BSA Trade Secrets constitute trade secrets.

179.    CommScope's BSA Trade Secrets are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

180.    CommScope's BSA Trade Secrets derive actual and potential independent commercial value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

181.    To the extent that CommScope communicated the BSA Trade Secrets to employees, CommScope did so in confidence.

182.    On information and belief, CommScope employee(s) breached CommScope's confidence by providing the BSA Trade Secrets to Defendants.

183.    Defendants have acquired and have used or are planning to use CommScope's BSA Trade Secrets under circumstances in which they knew or had reason to know that the BSA Trade Secrets were obtained without express or implied authority or consent and were not obtained by proper means.

184.    Defendants' actions in misappropriating CommScope's BSA Trade Secrets were done willfully and maliciously and to the detriment of CommScope.

185.    CommScope has taken reasonable steps to maintain the confidential nature of its Trade Secrets, including but not limited to the BSA Trade Secrets that Defendants have misappropriated and/or will misappropriate.

186.    Defendants' misappropriation of CommScope's BSA Trade Secrets has caused and will cause CommScope damages in an amount to be determined at trial.

187.    In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further

misappropriation, and to eliminate the commercial advantage that Defendants would otherwise derive from the misappropriation.

### COUNT IV
### MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
#### (Against All Defendants)

188.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

189.    CommScope possesses confidential information related to its BSA business, as described above, including but not limited to customer and potential customer information; sales, marketing and business plans; research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing, profit and cost information; customer and potential customer specifications; supplier information; inventions; and information about product design, research, development and capabilities.

190.    Defendants have acquired and have used or are planning to use CommScope's confidential information related to its BSA business under circumstances in which they knew or had reason to know that the information was obtained without express or implied authority or consent and was not obtained by proper means.

191.    CommScope has taken reasonable steps to maintain the confidential nature of its confidential information related to its BSA business, including but not limited to the confidential information that Defendants have misappropriated and/or will misappropriate.

192.    CommScope's confidential information related to its BSA business is nonpublic and confidential, is not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

193.    CommScope's confidential information related to its BSA business derives actual and potential independent commercial value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from its disclosure or use.

194.    Defendants' actions in misappropriating CommScope's confidential information related to its BSA business were done willfully and maliciously.

195.    Defendants' misappropriation of CommScope's confidential information related to its BSA business has caused and will cause CommScope damages in an amount to be determined at trial.

196.    In addition, CommScope will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to eliminate the commercial advantage that Defendants would otherwise derive from the misappropriation.

## COUNT V
## BREACH OF CONTRACT
### (Against the Individual Defendants)

197.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

198.    Defendant Javier agreed to the Andrew Corp. Employment Agreement and the CommScope Employment Agreement, and Defendant Cameron agreed to the CommScope Employment Agreement (the "Employment Agreements"), true and correct copies of which are attached hereto as Exhibits 1, 2 and 4.

199.    Cameron additionally agreed to the Separation and Release Agreement (together with the Employment Agreements, the "Agreements"), a true and correct copy of which is attached hereto as Exhibit 5.

200.    For a period of one year following the end of the Individual Defendants' employment relationship with CommScope, the Employment Agreements prohibit Javier and Cameron from, on behalf of a competitor, directly or indirectly soliciting any CommScope customer that he or she personally solicited or serviced on behalf of CommScope during the last twelve months of his or her employment with CommScope.

201.    The Agreements were supported by adequate consideration and are enforceable.

202.    CommScope has fully complied with all of its obligations under the Agreements.

203.    Javier personally solicited T-Mobile during the year prior to the end of her employment relationship with CommScope.

204.    Javier's efforts to sell BSAs to T-Mobile violate her obligations under the Employment Agreements not to solicit CommScope customers on behalf of a competitor for a period of one year following the end of her employment relationship with CommScope.

205.    Javier has solicited at least one CommScope employee about joining Rosenberger, in violation of her obligations under the Employment Agreements.

206.    Cameron personally serviced and/or had substantive contact with T-Mobile during the year prior to the end of his employment relationship with CommScope.

207.    Cameron assisted with Rosenberger and Javier's efforts to sell BSAs to T-Mobile. This violated his obligation under the Employment Agreements not to solicit CommScope customers on behalf of a competitor for a period of one year following the end of his employment relationship with CommScope.

208.     Both Javier and Cameron have used and are using CommScope confidential information to benefit Rosenberger and have shared confidential CommScope information with Rosenberger, in violation of their Agreements.

209.     CommScope has and will continue to suffer damages as a result of both Javier and Cameron's breach in an amount to be determined at trial.

210.     Further, CommScope has and will continue to suffer irreparable harm absent injunctive relief. The Employment Agreements specifically contemplate and expressly authorize such injunctive relief.

211.     In addition, the Employment Agreements expressly provide that in the event CommScope prevails in legal action to enforce any part of them, it is entitled to its reasonable costs and attorneys' fees.

### COUNT VI
### BREACH OF THE FIDUCIARY DUTY OF LOYALTY
### (Against the Individual Defendants)

212.     CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

213.     Under New Jersey law, an employee owes his or her employer a duty of loyalty, under which an employee must not act contrary to the employer's interest while employed.

214.     While they were employed by CommScope, Javier and Cameron entered into agreements with the Rosenberger Defendants to unlawfully harm CommScope in its ability to compete with Rosenberger by misappropriating CommScope's trade secrets and confidential information.

215.     While they were employed by CommScope, Javier and Cameron entered into agreements with the Rosenberger Defendants to unlawfully harm CommScope in its ability to

compete with Rosenberger by joining the Rosenberger Defendants in roles where they would violate their contractual non-solicitation and non-disclosure obligations to CommScope.

216.    Javier and Cameron acquired confidential CommScope information in the course of their employment by CommScope. Javier and Cameron owed CommScope fiduciary duties of loyalty with respect to that confidential CommScope information. Javier and Cameron have shared that confidential CommScope information with Rosenberger and are using it for Rosenberger's benefit and CommScope's detriment, including by soliciting CommScope customers with the benefit of confidential CommScope information.

217.    Javier and Cameron's breaches of their duties of loyalty to CommScope were done willfully and maliciously.

218.    As a direct and proximate result of Javier and Cameron's breaches of their duties of loyalty to CommScope, CommScope has been damaged in an amount to be determined at trial. In addition, CommScope has suffered irreparable harm and will continue to suffer irreparable harm unless CommScope's conduct is enjoined by this Court.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Against the Rosenberger Defendants and Javier)

219.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

220.    The Rosenberger Defendants are not parties to the Agreements between CommScope and Javier, or between CommScope and Cameron.

221.    Javier is not a party to the Agreements between CommScope and Cameron.

222.    The Rosenberger Defendants knew or should have known about the Agreements between CommScope and Javier, and between CommScope and Cameron.

—59—

223.    Javier knew or should have known about the Agreements between CommScope and Cameron.

224.    Javier and Cameron's Agreements were supported by adequate consideration and are enforceable.

225.    The Rosenberger Defendants have interfered with, and if not enjoined will continue to interfere with, Javier and Cameron's obligations to CommScope as set forth in their Agreements.

226.    Javier has interfered with, and if not enjoined will continue to interfere with, Cameron's obligations to CommScope as set forth in his Agreements.

227.    The Rosenberger Defendants intended to harm CommScope by interfering with Javier and Cameron's contractual obligations to CommScope. The Rosenberger Defendants intentionally procured the breach of those contractual obligations by recruiting and hiring Javier and Cameron to work in roles where they would solicit CommScope customers with whom they had substantive contact during the year prior to the end of their employment relationship with CommScope, and in which they would share confidential CommScope information with Rosenberger and use it for Rosenberger's benefit, in direct contravention of the non-solicitation and non-disclosure obligations in their Agreements.

228.    The Rosenberger Defendants' interference was and is improper and without justification or excuse. The Rosenberger Defendants interfered with Javier and Cameron's contractual obligations with the intent of injuring CommScope and improperly gaining a competitive and economic advantage at CommScope's expense. The Rosenberger Defendants have repeatedly targeted CommScope employees, both in China and in the United States. They have attracted CommScope employees by paying above-market wages meant to induce the

—60—

employees to breach their obligations to CommScope. And the Rosenberger Defendants continue to use confidential CommScope information obtained from former CommScope employees, such as a stolen copy of CommScope's Computational Software, when using Javier and Cameron to compete for CommScope customers in violation of their contracts.

229.    Javier intended to harm CommScope by interfering with Cameron's contractual obligations to CommScope. She intentionally procured the breach of those contractual obligations by involving Cameron in soliciting a CommScope customer with whom he had substantive contact during the year prior to the end of his employment relationship with CommScope, and in sharing confidential CommScope information with Rosenberger and using it for Rosenberger's benefit, in direct contravention of the non-solicitation and non-disclosure obligations in his Agreements.

230.    Javier's interference was and is improper and without justification or excuse. Javier interfered with Cameron's contractual obligations, with the intent of injuring CommScope and improperly gaining a competitive and economic advantage at CommScope's expense. Javier continues to interfere with CommScope employees' contracts, in violation of her non-solicitation obligations. She also continues to involve Cameron in using materials prepared with a stolen copy of CommScope's Computational Software to unfairly attract CommScope customers to Rosenberger, in violation of their non-solicitation obligations.

231.    As a direct and proximate result of the Rosenberger Defendants' and Javier's tortious interference with contract, CommScope has been damaged in an amount to be determined at trial. In addition, CommScope has suffered irreparable harm and will continue to suffer irreparable harm unless CommScope's conduct is enjoined by this Court.

**COUNT VIII**

## UNFAIR COMPETITION
### (Against All Defendants)

232.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

233.    Defendants' misappropriation of CommScope's BSA Trade Secrets, as alleged herein, constitutes an unfair method of competition.

234.    The Rosenberger Defendants' tortious interference with Javier and Cameron's Agreements, and Javier's interference with Cameron's Agreements, as alleged herein, constitutes an unfair method of competition.

235.    CommScope's BSA Trade Secrets and confidential information were developed through a substantial investment of resources and have commercial value.

236.    Defendants' actions in misappropriating and utilizing CommScope's BSA Trade Secrets and confidential information constitute an unfair method of competition.

237.    Defendants' actions, as alleged herein, were unfair under all of the facts and circumstances, in that Defendants acted in bad faith, inequitably, and in a manner that undermines the ethical standards and good faith dealings between parties engaged in competition.

238.    Defendants' unfair methods of competition affected commerce.

239.    As a direct and proximate result of Defendants' unfair methods of competition, CommScope was harmed in its competition with the Rosenberger Defendants in the sale of BSAs.

240.    Defendants' actions in misappropriating CommScope's BSA Trade Secrets, and in tortiously interfering with Javier and Cameron's Agreements with CommScope, were done willfully.

241.    As a direct and proximate result of Defendants' unfair methods of competition, CommScope has been damaged in an amount to be determined at trial.

## COUNT XI
## CIVIL CONSPIRACY
### (Against All Defendants)

242.    CommScope realleges and incorporates by reference herein the foregoing allegations of the Complaint.

243.    Under New Jersey law, a civil conspiracy requires a combination of two or more persons; a real agreement or confederation with a common design; the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and special damages.

244.    The Rosenberger Defendants and the Individual Defendants have agreed to unlawfully harm CommScope in its ability to compete with Rosenberger by misappropriating CommScope's trade secrets and confidential information and interfering with CommScope's employment contracts. Javier and Cameron each reached this agreement with the Rosenberger Defendants while they were employed by CommScope. Rosenberger Site Solutions is a partially owned subsidiary of Rosenberger USA and constitutes an independent center of decisionmaking from the other Rosenberger Defendants.

245.    Defendants' actions undertaken in furtherance of the agreement include, but are not limited to, the Rosenberger Defendants' use of CommScope trade secrets and confidential information to create and sell BSAs, including at the Rosenberger New Jersey Offices; the Rosenberger Defendants' employment of the Individual Defendants in violation of their Agreements with CommScope; the Individual Defendants' violation of their Agreements with CommScope, including by engaging in solicitation in New Jersey and using CommScope confidential information for the benefit of the Rosenberger Asia Office in New Jersey; and

Rosenberger Site Solutions', NWI's, and CellMax's sale of Rosenberger BSAs incorporating CommScope trade secrets. As a direct and proximate result of these actions, CommScope has been damaged in an amount to be determined at trial.

**WHEREFORE,** CommScope prays for the following relief:

1. An Order granting preliminary and permanent injunctive relief preventing the Rosenberger Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Rosenberger Defendants, or controlling the Rosenberger Defendants or controlled by the Rosenberger Defendants, or in active concert or participation with the Rosenberger Defendants, from engaging in and continuing to benefit from the wrongful conduct described herein, and eliminating the Rosenberger Defendants' inequitable advantages arising from the wrongful conduct;

2. An Order requiring the Rosenberger Defendants and all of their respective agents, servants, officers, directors, employees, and all others holding by or through the Rosenberger Defendants, or controlling the Rosenberger Defendants or controlled by the Rosenberger Defendants, or in active concert or participation with the Rosenberger Defendants, to deliver to CommScope all materials embodying, deriving from, or otherwise revealing CommScope's trade secrets;

3. An Order granting preliminary and permanent injunctive relief preventing the Individual Defendants from engaging in the wrongful conduct described herein and equitably extending their contractual obligations so that they do not unfairly benefit from the period during which they were not in compliance;

4.     Awarding CommScope damages for the breaches, statutory violations, and tortious conduct described herein;

5.     Awarding CommScope damages for any unjust enrichment caused by the Rosenberger Defendants' misappropriation of trade secrets that is not addressed in computing damages for actual losses to CommScope;

6.     Awarding CommScope exemplary damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3), in an amount two (2) times the amount of the combined actual and unjust enrichment damages;

7.     Awarding CommScope punitive damages under the New Jersey Trade Secrets Act, N.J.S.A. § 56:15-4(b);

8.     Awarding CommScope punitive damages for the Defendants' torts;

9.     Awarding CommScope interest, reasonable attorneys' fees, and costs available under the law;

10.    Setting for trial by jury all issues that are triable; and

11.    Awarding CommScope such other, further, or different relief as the Court deems just and proper.


Dated: November 1, 2019          Faegre Baker Daniels LLP

                                 /s/ Randy Kahnke

                                 Edward G. Sponzilli
                                 NORRIS MCLAUGHLIN & MARCUS, P.A.
                                 400 Crossing Boulevard, 8th Floor
                                 Bridgewater, NJ 08807
                                 Telephone: (908) 722-0700
                                 Facsimile: (908) 722-0755
                                 Email: egsponzilli@nmmlaw.com

                                 Randall E. Kahnke (MN Atty. No. 202745)

*Pro Hac Vice*
Tyler Young (MN Atty. No. 395017)
*Pro Hac Vice*
Anna E. Sallstrom (MN Atty. No. 400489)
*Pro Hac Vice*
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600
Email: randall.kahnke@faegrebd.com
        tyler.young@faegrebd.com
        anna.sallstrom@faegrebd.com

Harmony Mappes (IN Atty. No. 27237-49)
*Pro Hac Vice*
Faegre Baker Daniels LLP
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Phone: (317) 237-0300
Fax: (317) 237-1000
Email: harmony.mappes@faegrebd.com

Attorneys for Plaintiff CommScope, Inc.

## <u>LOCAL CIV. R. 11.2 CERTIFICATION</u>

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

/s/ Randy Kahnke
Randall E. Kahnke

Dated:  November 1, 2019