<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COMMSCOPE, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ROSENBERGER TECHNOLOGY (KUNSHAN) CO. LTD., et al., <br><br> *Defendants*. | Civil Action No. 19-15962 <br><br> OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Plaintiff CommScope, Inc.'s ("Plaintiff" or "CommScope") Motion for Preliminary Injunction Against Rosenberger Defendants, ECF No. 173. Defendants Rosenberger Technology (Kunshan) Co. Ltd., Rosenberger Asia Pacific Electronic Co., Ltd., Rosenberger Technology LLC, Rosenberger USA Corp., Rosenberger North America Pennsauken, Inc., Rosenberger Site Solutions, LLC, and Rosenberger Hochfrequenztechnik GmbH & Co. KG (collectively, "Defendants" or "Rosenberger") oppose the Motion. ECF No. 218. The Court held a hearing for oral argument on the Motion on October 28, 2020.[1] For the reasons explained below, the Motion is **DENIED**.

---

[1] Following oral argument, at the Court's request, the parties submitted supplemental briefing on the specific questions raised at the hearing related to the issue of irreparable harm. The parties submitted those papers on November 6, 2020. See CommScope's Post-Hearing Brief, ECF No 348 ("Pl. Supp. Br."), and Rosenberger Defendants' Post-Hearing Brief, ECF No. 349 ("Defs. Supp. Br.")

1

I. **FACTUAL BACKGROUND**

This matter arises out of Defendants' alleged misappropriation of trade secret software that is used in the design of base station antennas ("BSAs"). See generally Am. Compl., ECF No. 50.

CommScope and Rosenberger are both in the business of designing and selling BSAs. To assist in the process of designing and selling BSAs, CommScope developed two software programs: the Andrew Antenna Analysis Program ("AAAP") and the Particle Swarm Optimization Antenna Analysis ("PSOAA") (collectively, the "BSA Software Programs"). See generally CommScope Ex. 3, Declaration of Martin Zimmerman, ECF 175.3 ("Zimmerman Decl."). The BSA Software Programs provide certain useful features for CommScope's design engineers and sales representatives. The functionality of these programs is relevant to the present Motion.

AAAP is a data analysis and visualization program that analyzes BSA pattern performance over a variety of parameters. See id. ¶ 5. AAAP provides flexibility to engineers in the BSA design process because engineers can redefine, add, or remove these parameters at the engineer's discretion. Id. AAAP also has utility in the sales process as it allows the user to "define and display BSA parameters consistent with each customer's unique needs and preference." Id. ¶ 9. CommScope argues that this ability to display and easily manage these parameters speeds up the design time for any given BSA. Id. ¶ 7.

While AAAP helpfully displays a given BSA's performance, it does not dictate the ultimate design of that BSA. Rosenberger Ex. 4, Expert Declaration of Warren Stutzman ¶ 196, ECF No. 220 ("Stutzman Decl."). CommScope's own expert confirms that it is the designer who dictates any adjustments to BSAs in the development process, not AAAP. See CommScope Ex. 7, Declaration of Dr. Robert Akl ¶ 56, ECF No. 175.7 ("Akl Decl.") ("Once these patterns are viewed

2

and analyzed with all the statistical values accounted for in a single analysis, the designer can then make adjustments and re-test the prototype (or re-simulate the design).").

PSOAA allows engineers to create virtual mockups of antennas so that they can evaluate the antenna's performance before developing a physical model.[2]  Zimmerman Decl. ¶ 11. Specifically, PSOAA calculates the expected performance of a designed BSA, optimizes it along different variables, and "enables engineers to further fine-tune the design by tweaking its parameters (such as amplitude, phase, and arrangement of radiating elements) and checking their impact on performance."  Id.  Rosenberger's expert explains that "PSOAA provides a mathematical calculation that may provide a convenient or quick calculation for inexperienced engineers but is not useful for the ultimate simulation of performance."  Stutzman Decl. ¶ 197. PSOAA functions by implementing a commonly known "particle swarm algorithm" in a "conventional way."  Id. ¶ 123.  The parties dispute the degree to which PSOAA can be characterized as a simulation tool but, in any event, the program assists in BSA design by optimizing and visualizing BSA performance.  In turn, this helps the user evaluate customer specifications and efficiently improve a model's performance.  See Akl Decl. ¶ 67; Zimmerman Decl. ¶ 17.

CommScope is a leader in the United States BSA market and has strong relationships with the major wireless carriers.  CommScope Ex. 8, Declaration of Allan Shampine ¶ 13, ECF No. 175.12 ("Shampine Decl.").  Rosenberger, in contrast, has had limited success in the United States market.  By way of example, the total of BSA sales in the United States was $575 million in 2017;

---

[2] Later versions of PSOAA allow for some advanced functionality, such as the ability to "analyze the data in AAAP." Zimmerman Decl. ¶ 17.  At oral argument, Rosenberger argued that the only version of PSOAA it used was Version 1.0.  See Stutzman Decl. ¶¶ 118-24, 198.  In its post-hearing briefing, CommScope asserts in a footnote that "Rosenberger misappropriated two versions of PSOAA—Version 1.0 and Version 2.1—but only admits to using Version 1.0."  Pl. Supp. Br. at 5-6, n.3.  The factual citation CommScope provides in support of this assertion does not demonstrate that Rosenberger used Version 2.1.  As such, the Court considers only Version 1.0 with respect to its analysis.

Rosenberger had U.S. sales of approximately $35,000 in 2016, $437,000 in 2017, $2.7 million in 2018, and $3.3 million in 2019.  See Rosenberger Ex. 7, Declaration of Ryan Sullivan ¶ 72, ECF No. 221; Defs. Supp. Br. at 4 n.5.  CommScope asserts that successfully competing in the U.S. market is strongly influenced by speed to market and established sales relationships.  Specifically, CommScope argues that speed to market is critical because BSA technology evolves quickly and because BSAs are often custom designed to fit the needs of a specific customer, allowing a sale to be locked up.  See, e.g., Shampine Decl. ¶¶ 15, 39; see also CommScope Ex. 11, Transcript of Deposition of Rosenberger pursuant to Rule 30(b)(6) at 88:1-10, ECF No. 178.1.  Similarly, CommScope argues that sales relationships in the BSA market are "sticky," in that once they are established, they can be difficult to dislodge.  Shampine Decl. ¶ 7.  However, the record also reflects that telecommunications carriers "generally use multiple vendors nationally."  Id.

CommScope became aware of Rosenberger's use of its software programs around August 2018 when CommScope personnel obtained a Rosenberger customer presentation from a client that appeared to show Rosenberger was using AAAP to pitch BSAs to customers in the United States.  See CommScope Ex. 1, Declaration of Farid Firouzbakht ¶ 2, ECF No. 175.1.  By the end of September 2018, CommScope had learned that a former employee had gone to work for Rosenberger and had identified a cyber-security incident related to a departing employee who had previously worked at Rosenberger.  Id.  In November 2018, CommScope contacted the Federal Bureau of Investigations ("FBI") to report that it believed Rosenberger might be infringing its intellectual property.  Id. ¶ 3.  After reporting its concerns to the FBI, CommScope became aware that Rosenberger was also using PSOAA when a then-Rosenberger employee told CommScope he was using it in his work.  Id. ¶ 7.  In May 2019, after continued discussions, the FBI informed CommScope it would not be pursuing an action against Rosenberger.  Id. ¶ 8.  Two months later,

Plaintiff initiated this litigation in the District of New Jersey on July 29, 2019.  See Compl., ECF No. 1.

## II. PROCEDURAL HISTORY

On November 1, 2019, CommScope filed the nine-count Amended Complaint alleging, inter alia, misappropriation of trade secrets in contravention of state and federal law.  See Am. Compl.  Rosenberger ceased all use of the BSA Software Programs on August 28, 2019, and in December 2019, the parties entered a Stipulated Order prohibiting Rosenberger from "using, in any way or anywhere" the BSA Software Programs.  ECF No. 102.[3]  Specifically, the Stipulated Order:

> (a) Enjoins the Rosenberger Defendants, their agents and subsidiaries under their control—regardless of location—and those who are in active concert or participation with the Rosenberger Defendants, from using, in any way or anywhere, any version or copy of AAAP, PSOAA, Satimo Macro Generator, HFSS to AAF, CST to AAF, or AAAP Import Automation, from the entry date of this order until the entry date of final judgment in this action; [and]
>
> (b) Enjoins the Rosenberger Defendants, their agents and subsidiaries under their control—regardless of location—and those who are in active concert or participation with the Rosenberger Defendants, from using, in any way or anywhere, any BSA-related plots, reports, or files unless Rosenberger has confirmed that the plots, reports, or files were generated by software other than AAAP, PSOAA, Satimo Macro Generator, HFSS to AAF, CST to AAF, or AAAP Import Automation, from the entry date of this order until the entry date of final judgment in this action.

Id.  The Stipulated Order did not, however, expressly enjoin the sale of BSAs that were designed with or in reference to the BSA Software Programs.

---

[3] The Court so-ordered the Stipulated Order on November 10, 2020.  ECF No. 350.

Subsequently, CommScope moved for a preliminary injunction on the basis that Rosenberger's voluntary cessation of the use of the BSA Software Programs was "not enough, because it does not redress the unfair advantage Rosenberger has gained" through its prior use of the programs. Pl. Br. at 3, ECF No. 174. In an October 13, 2020 letter to the Court, however, Rosenberger notified the Court that it decided to "voluntarily discontinue selling BSA models as to which AAAP or PSOAA were used in some way during the development process, and [they] have so informed CommScope." ECF No. 334. Rosenberger explained that it still "vigorously disputes CommScope's claims and requested relief" but took this action "solely in order to narrow the issues before the Court." Id.

Accordingly, because Rosenberger is enjoined from using the BSA Software Programs and discontinued the sale of BSA models which used the BSA Software Programs in the development process, the narrow issue before the Court is whether CommScope should be enjoined from "sell[ing] any base station antenna in or for use in the United States, unless and until Rosenberger demonstrates that any such base station antenna is not derived from the use of CommScope's trade-secret software." Proposed Order ¶ 6, ECF No. 173.1 (emphasis added). In other words, CommScope seeks to enjoin the sale of BSAs that—though designed without the direct use of the alleged trade secrets—are nonetheless somehow otherwise derived from the alleged trade secrets.[4] CommScope's essential theory for this "use injunction" is that "Rosenberger's misuse of CommScope's software potentially infects Rosenberger's entire BSA portfolio. [Thus, e]ven if

---

[4] CommScope seeks a use injunction in the first instance. A "use injunction includes the trade secret itself and anything substantially derived from it." Pl. Supp. Br. at 13; see Signazon Corp. v. Nickelson, No. 13-11190, 2013 WL 3990651, at *2 (D. Mass. Aug. 6, 2013) (enjoining use of anything "substantially derived from [copyrighted material]"). In the alternative, CommScope seeks a "head start" production injunction barring Rosenberger from selling any BSAs in the United States for one year. Pl. Supp. Br. at 3, 24. A "head start" or "lead time" production injunction is one that "lasts only so long as is necessary to negate the advantage the misappropriator would otherwise obtain by foregoing independent development." Par Pharm., Inc. v. QuVa Pharma, Inc., 764 F. App'x 273, 280 (3d Cir. 2019) (internal citation omitted).

Rosenberger did not use AAAP or PSOAA on an individual BSA, that BSA's design may have been influenced by a prior BSA that was developed using AAAP or PSOAA." Pl. Br. at 42. In the alternative, CommScope seeks a one-year "head start" or "lead time" production injunction that would bar Rosenberger from selling any BSAs in the United States for one year. CommScope argues that a production injunction would similarly offset the unfair advantage Rosenberger allegedly gained from its use of the BSA Software Programs. Pl. Br. at 44.

### III. LEGAL STANDARD

A party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). Having considered the arguments raised in the parties' papers and at oral argument, the Court finds that Plaintiff has failed to meet its burden to establish that it would suffer irreparable harm absent an injunction.

To establish irreparable harm, a plaintiff "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial," such as monetary damages. Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). In other words, a "preliminary injunction must be the only way of protecting the plaintiff from harm." Id. The plaintiff must further demonstrate a causal connection between the harm alleged and the conduct to be enjoined. See, e.g., I.M. Wilson, Inc. v. Grichko, No. 18-5194, 2019 WL 5394113, at *4 (E.D. Pa. Oct. 22, 2019). Additionally, the feared harm must be "immediate" and not merely speculative. ECRI v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (citations and

quotations omitted); see Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000) ("[T]he risk of irreparable harm must not be speculative.").

Loss of market share can establish irreparable harm in some circumstances. Norvartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002). Irreparable harm may also be found if a plaintiff can establish it would "suffer some harm to its reputation and good-will" absent an injunction. Genovese Drug Stores, Inc. v. TGC Stores, Inc., 939 F. Supp. 340, 350 (D.N.J. 1996). Finally, in trade secret cases, irreparable harm can be found when the defendant intends to use or disclose the trade secret. See SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985).

## IV. ANALYSIS

CommScope alleges three types of irreparable harm: (1) harm to market share; (2) loss of good will; and (3) use of its trade secret. The Court addresses each in turn.

### A. Harm to Market Share

CommScope argues that it will suffer irreparable harm absent an injunction because it is on the verge of losing market share to Rosenberger. See Pl. Supp. Br. at 10-11. The Court disagrees.

"In a competitive industry where consumers are brand-loyal," loss of market share can constitute irreparable harm. Novartis Consumer Health, Inc., 290 F.3d at 596. However, the loss of market share still must be imminent and non-speculative. See Weeks Marine, Inc. v. TDM Am., LLC, No. 11-3850, 2011 WL 6217799, at *5 (D.N.J. Dec. 14, 2011); see also Novartis Consumer

Health, Inc., 290 F.3d at 596 (observing a measurable loss in market share evinced by a decrease in sales for one party and an increase for the other).

As an initial matter, Plaintiff has not demonstrated that the alleged misappropriation has already translated into a loss of market share or increased sales to Defendants. Between 2016 and 2019, the period when Rosenberger engineers used the BSA Software Programs, Rosenberger's sales amounted to less than 1% of the U.S. BSA market. CommScope's own economic expert did not argue that CommScope lost any meaningful sales or share of the market to Rosenberger. Instead, he stated, "while Rosenberger may be on the verge of obtaining sales relationships by using those trade secrets, it has, for the most part, not yet consummated those relationships." Shampine Decl. ¶ 48.

With respect to potential future loss, Plaintiff argues that Defendants are poised to gain a foothold in the U.S. BSA market and have already begun fostering sales relationships with U.S. wireless carriers, which should amount to imminent irreparable harm. In support, Plaintiff points to evidence that customer relationships in this industry are "sticky," such that a successful sale by Rosenberger could help establish a meaningful foothold in the market. See Shampine Decl. ¶¶ 30-34, 50. However, this argument cuts both ways. Considering Rosenberger's miniscule share of the current U.S. BSA market, CommScope's much larger share of the market and its well-established customer relationships are unlikely to be seriously threatened by competition from Rosenberger. Moreover, Plaintiff's own expert, Dr. Shampine, stated that it is not clear that CommScope's market share will be irreparably harmed before the merits are litigated at trial. Rosenberger Ex. 9, Transcript of Deposition of Allan Shampine at 75:11-76:8, ECF No. 222

9

("Shampine Tr.").[5] This uncertainty evinces the speculative nature of this alleged harm to market share. As such, these concerns amount to a mere hypothetical risk rather than a clear showing of imminent harm. See AV Sols., LLC v. Keystone Enterprise Services, LLC, No. 11-3503, 2011 WL 2971222 at *2 (D.N.J. July 19, 2011) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury.") (quoting ECRI, 809 F.2d at 226).[6]

In its supplemental briefing, CommScope raises concerns about Rosenberger's on-going sales conversations with T-Mobile. CommScope argues that Rosenberger is currently offering BSAs for sale to T-Mobile that were developed by an engineer who allegedly stole the BSA software from CommScope but could not remember using them in developing these BSAs. Pl. Supp. Br. at 12. CommScope also cites the concern that individual Defendant and former CommScope Key Account Manager for T-Mobile, Janet Javier, has worked on this sales relationship for Rosenberger. Pl. Supp. Br. at 11. However, even if Defendants are able to successfully broker this sale, it is not clear that the use injunction sought would bar this specific sale since the engineer does not recall using the BSA Software Programs in the design. See I.M. Wilson, Inc., 2019 WL 5394113, at *4 (explaining "a preliminary injunction's exclusive ability to protect a plaintiff from irreparable harm inherently requires a causal connection between the

---

[5] Dr. Shampine was asked, "[w]hen is it likely that in the future Rosenberger will obtain sales shares on its own merits?" In response he stated, "Again, we don't know. I mean, I take it that the point that you're trying to drive at is that what's going to happen between now and trial? Is there a chance that nothing will happen between now and trial…The answer is yes, that could happen. It might be that Rosenberger, if no preliminary injunction issues, just isn't going to get a big sales contract in the interim…What are the odds of that? I can't say for sure. What would the timing of that be? I can't say for sure." Shampine Tr. 75:11-76:8.

[6] The immediacy of any harm to Plaintiff is further undercut by its delay in bringing this Motion. While on-going discussions with law enforcement may justify some delay in seeking a preliminary injunction, see Genentech, Inc. v. JHL Biotech, Inc., No. 18-06582, 2019 WL 1045911, at *20 (N.D. Cal. Mar. 5, 2019), Plaintiff here commenced this litigation two months after the FBI decided not to bring an enforcement action and the instant Motion two months after the parties entered into the Stipulated Order prohibiting Defendants' use of the BSA Software Programs.

injunction and harm"). Thus, the present record does not clearly establish that Plaintiff's preferred injunction would remedy this speculated harm.

Moreover, CommScope has offered no compelling reason—at the hearing or in its filings—as to why money damages would be an inadequate remedy here. For example, even if CommScope is later able to establish that Rosenberger's impending sale to T-Mobile or any other sales were specifically tainted by the use of the BSA Software Programs, CommScope has not demonstrated that some percentage of these readily identifiable sales would be inadequate to address its harm. See Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) ("The availability of adequate monetary damages belies a claim of irreparable injury."); Acierno v. New Castle Cnty., 40 F.3d 645, 653 (3d Cir. 1994). CommScope's Rule 30(b)(6) representative even testified "that someone who is an expert in doing those types of calculations, which I am not, should be able to come up with a number." Rosenberger Ex. 11, Deposition of CommScope pursuant to Rule 30(b)(6) at 223:10-19, ECF No. 222 ("Zimmerman Tr."). The probability that monetary damages can be reasonably calculated and awarded here following a successful trial of the merits weighs against finding irreparable harm.

Therefore, the Court is not convinced that absent an injunction, Plaintiff will suffer irreparable harm to its share of the U.S. BSA market.

### B. Loss of Good Will

CommScope also argues that Rosenberger's continued sale of BSAs developed and marketed with CommScope's trade-secret software will continue to harm its good will and reputation. The Court disagrees.

"[L]oss of good will" in a company's market can constitute grounds for irreparable harm. See Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc., 306 F. App'x 727, 731 (3d Cir. 2009); see

11

also BP Chem. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 263 (3d Cir. 2000) ("Such injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy."). Here, CommScope argues that Rosenberger has harmed CommScope's good-will by using CommScope's trade secret software in sales activities. In support, CommScope points out that Rosenberger used AAAP to generate marketing materials that were sent to customers. Pl. Br. at 37. However, Rosenberger's expert has averred that it is "entirely unrealistic" that a BSA customer would believe that CommScope's BSAs are interchangeable with Rosenberger's BSAs based solely on AAAP-generated marketing materials displaying performance data. Rosenberger Ex. 6, Declaration of Timothy Krause ¶¶ 37-38, ECF No. 220.4.

On the present record, CommScope has not made a strong showing that its good-will in the U.S. market is threatened by Rosenberger continuing to sell independently-designed BSAs. See Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 196 (3d Cir. 1990) (explaining irreparable harm follows "where the plaintiff makes a strong showing of likely confusion" as to the source of a product or service). CommScope has not pointed to any clear evidence that future reputational harm is imminent. Rosenberger has ceased using these marketing materials and is barred from using the BSA Software Programs' outputs pursuant to the Stipulated Order. Any confusion as to the source of AAAP-generated marketing materials is in the past and the requested injunction would not rectify that harm. See I.M. Wilson, Inc., 2019 WL 5394113, at *4 (explaining need for causal connection between harm and injunction); Instant Air Freight Co., 882 F.2d at 801 ("The preliminary injunction must be the only way of protecting the plaintiff from harm."). Here too, to the extent CommScope later proves misappropriation, money damages could rectify this injury. See Acierno, 40 F.3d at 653.

Therefore, the Court is not convinced on the record before it that there is a credible imminent loss of good-will that justifies issuing a preliminary injunction in this instance. Pl. Br. at 37.

### C. Trade Secret Use and Disclosure

Finally, the law is clear that "[i]mproper use of trade secrets constitutes irreparable harm." ADP, LLC, v. Olson, No. 20-3312, 2020 WL 6305554, at *12 (D.N.J. Oct. 28, 2020). Here, however, direct use of the trade secret—the BSA Software Programs—is not at issue since Rosenberger has not used the programs since August 2019 and is indeed presently prohibited from using them pursuant to the Court-entered Stipulated Order.

Rather, Plaintiff argues that because "Rosenberger continues to use CommScope's trade secrets—in the form of BSAs substantially derived from CommScope's software—CommScope is suffering and will continue to suffer irreparable harm absent an injunction." Pl. Supp. Br. at 10 (emphasis added). The Court disagrees.

#### i. Standard for "Use" of a Trade Secret

"[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." Campbell Soup Co. v. Conagra Inc., 977 F.2d 86, 92 (3d Cir. 1992). The manufacture or sale of materials "substantially derived" from a trade secret constitutes "use" of that trade secret. See Restatement (Third) of Unfair Competition § 40 (2020) ("[A]n actor is liable for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret."); see also Gen. Elec. Co. v. Sung, 843 F. Supp. 776, 778 (D. Mass. 1994) (explaining trade secret protection extends "to materials 'substantially derived' from that trade secret"); Rockwell Graphic Sys., Inc. v. DEV Indus., Inc., No. 84-6746, 1993 WL 286484, at *6 (N.D. Ill. July 29, 1993)

13

(same).  Rosenberger is no longer using the allegedly trade secret software.  However, the Court must consider whether Rosenberger is continuing to use the alleged trade secrets by selling BSAs "substantially derived" from the BSA Software Programs.  See Rohm & Haas Co. v. AZS Corp., No. 1:85-4337, 1989 WL 1647330, at *1 (N.D. Ga. Feb. 7, 1989) (enjoining defendants "using or disclosing the [trade secret] K–40 production process and from making, using or selling any product including, without limitation, K–40, or Seycorez K–40, which is substantially derived from the trade secret.").[7]

### ii. **Rosenberger is Not Using the BSA Software Programs**

Defendants are no longer using the BSA Software Programs and are barred from doing so pursuant to the Stipulated Order.  Defendants have also represented to the Court that they have discontinued the sale of their BSA models in which the software programs were used in some way during the design process (the "Influenced BSAs").[8]  Nonetheless, Plaintiff seeks an injunction that would take these restrictions a step further: precluding the sale of any BSAs that are influenced by or derivative of the Influenced BSAs.  The question the Court must consider, therefore, is whether BSAs that were designed without the direct use of the BSA Software Programs could

---

[7] Rosenberger argues that the correct standard to apply in considering CommScope's primary request for a use-injunction is whether its BSAs are "inextricably intertwined" with the BSA Software Programs.  Indeed, CommScope initially asserted in its papers that"[t]he correct standard is whether the BSAs are 'inextricably intertwined' with the software."  Reply at 16, ECF No. 238.  At the hearing, CommScope appeared to pivot and cited this as the standard for its head-start injunction, see CommScope's Hearing PowerPoint Slides at 92, ECF No. 348.1, while arguing the "substantially derived" standard applies to its use injunction, id. at 75.  In Sung, the court explained that the "inextricably intertwined" standard is applied to production injunctions, which are typically issued "in circumstances where a use injunction would be ineffective in eliminating the competitive advantage gained by the misappropriator." Sung, 843 843 F. Supp. 776, 779 (D. Mass. 1994).  Thus, with respect to CommScope's request for a use injunction, the substantially derived standard applies.

[8] That the Influenced BSAs are not at risk of being sold bears directly on whether CommScope faces a risk of irreparable harm.  See Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 219 (3d Cir. 2014) ("Whether a defendant's conduct has ceased is certainly a relevant consideration in making [an irreparable harm] determination, and the District Court did not err in considering and crediting [defendant's] certifications that the allegedly false statements would not be repeated.").

nonetheless be "substantially derived" from the allegedly trade secret software. The facts bear out that they cannot.[9]

Plaintiff argues that using the BSA Software Programs "to design a BSA makes that BSA—and the components that comprise it—better." Pl. Supp. Br. at 4. Even if that is true, the BSA Software Programs are not design-blueprints nor do they contain information so valuable that a BSA for which the programs were used in the design process can be considered a direct by-product of the programs. See Sung, 843 F. Supp at 779. In Sung, the court found that a "5,000-ton apparatus and [the] specifications for its operation" were "substantially derived from the 487 pages of documents" that constituted GE's trade secret blueprints for a manufacturing process. Id. There, the defendant engineers explicitly utilized the trade secret blueprints as a model when developing their own apparatus. Id.; see also Rockwell Graphic Sys., Inc., 1993 WL 286484, at *6 (enjoining manufacturer from the sale of "piece parts" substantially derived from plaintiff's trade secret drawings for "piece parts"). In contrast, the trade secrets in question here are not blueprints for the design of BSAs. Rather, they are data analysis and visualizations programs that assist engineers in modifying BSAs during the design process to optimize performance—not design instructions on which Rosenberger's engineers relied. Therefore, the use of the BSA

---

[9] While the Parties argue over which standard the Court should apply, the Court is not convinced this distinction changes the outcome. Under the "inextricably intertwined" standard, which applies to production injunctions,"[a]n 'inextricable connection' is found where the trade secrets form such an integral and substantial part of a comprehensive manufacturing process or technology that, absent the misappropriated trade secrets, the defendant would not be able independently to manufacture or design a comparable product." Sung, 843 F. Supp. at 780. Thus, both standards require the Court to analyze the role the BSA Software Programs play in the design of BSAs and whether later generation BSAs could somehow be tainted by the programs. Here, the Court finds that Rosenberger's independently designed BSAs are not "inextricably connected" to the BSA Software Programs because Rosenberger could independently manufacture and design their own BSAs without reference to the BSA Software Programs. The record clearly supports the conclusion that, absent the BSA Software Programs, Rosenberger would still be able to (and has continued to) independently manufacture and design its own BSAs. Rosenberger Ex. 1, Declaration of Cai Lishao ¶¶ 4, 7-10, ECF No. 219.1; Zimmerman Tr. at 219:18-220:2 ("all of our competitors [develop BSAs] without the aid of AAAP or PSOAA"); see E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 894 F. Supp. 2d 691, 712 (E.D. Va. 2012) (explaining a production injunction "likely would not be appropriate" where defendant possessed a "significant and comparable, preexisting design of its own prior to the misappropriation of the trade secrets") (vacated on other grounds).

Software Programs during the design process does not bake them into the final design of the BSA. This distinguishes the instant case from Sung and Rockwell where the design of the product was directly guided by the trade secret.

Plaintiff further argues that the BSA design process is quite iterative in that a given BSA's design is influenced by the design of the previous generation of BSAs.  Again, even if that is true, the Court fails to see how reference to an Influenced BSA would constitute use of the BSA Software Programs.  The design and manufacture of a BSA is a lengthy and complicated process wherein Rosenberger only used the BSA Software Programs at three discrete sub-steps in a development process containing more than 50 sub-steps.  Stutzman Decl. ¶¶ 192-93.  Moreover, CommScope's own witnesses agree that the BSA Software Programs do not dictate design. CommScope Ex. 19, Transcript of Deposition of Bennett Cardwell at 301:11-13, ECF 178.9 ("Q. And it's possible to design BSA without using AAAP? A. Yes."); Rosenberger Ex. 15, Transcript of Deposition of Jinchun (Spring) He at 203:19-204:6, ECF No. 222 ("Q. Would you agree with me that even without PSOAA, CommScope's final antenna designs may have come slower, but they would have ended up at the same place? A. I agree with that viewpoint.").  These programs are thus clearly distinguishable from design blueprints or manufacturing drawings from which courts typically find substantial derivation in the byproduct of a trade secret.  As such, it is arguable whether even the Influenced BSAs themselves can be considered substantially derived from the BSA Software Programs.[10]  It thus stretches the standard to consider later-designed BSAs, whose engineers did not use these design-tools, as being "substantially derived" therefrom.  Thus, even if the design of an Influenced BSA was a model for a later generation BSA, the taint of

---

[10] For purposes of the instant Motion, the Court makes no findings as to whether the BSA Software Programs or the Influenced BSAs are trade secrets.

CommScope's trade secret would not be carried over (as the software is not baked into the design). Plaintiff's concern that every BSA in Defendants' portfolio is possibly tainted by the BSA Software Programs—regardless of whether they were used in a given BSA's design process—is simply too speculative to warrant injunctive relief.

Simply put, the injunction CommScope seeks reaches too far. Courts have enjoined products after finding that they "contain or are substantially derived from" a trade secret. See, e.g., ClearOne Commc'ns, Inc. v. Bowers, 643 F.3d 735, 752 (10th Cir. 2011) (affirming injunction of an "object code," a "computer code," and numerous software products that the district court determined "contain or are substantially derived from [a trade secret algorithm]"). However, the Court is unaware of any injunction that enjoined the sale of products, which themselves do not contain or directly derive from a trade secret but are somehow derived from an earlier allegedly tainted product. Nor is it aware of any courts that have enjoined the development of products "until and unless" the enjoined party proves that the proposed product is not "derived" from a trade secret—particularly as in here, where the potentially enjoined party has voluntarily agreed to discontinue selling any product which may have used the trade secret in the development process. Because the Court finds that Plaintiff has not demonstrated irreparable harm, the Court does not reach the other factors which must be met for an injunction to issue. See Hohe v. Casey, 868 F.2d 69, 70-73 (3d Cir. 1989) (explaining a showing of irreparable harm is necessary for the issuance of a preliminary injunction).

Therefore, the Court is not convinced that the sale of BSAs that Defendants developed without the use of the BSA Software Programs constitutes "use" of those programs. Since

Rosenberger is no longer using CommScope's alleged trade secrets, CommScope does not face any risk of irreparable harm absent an injunction prior to trial.[11]

## V. CONCLUSION

For the reasons contained herein, Plaintiff's Motion for a Preliminary Injunction is **DENIED**. An appropriate order accompanies this Opinion.

**Dated**: April 20, 2021

*/s Madeline Cox Arleo*
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

[11] Since the Court finds that there is no irreparable harm, there is no need to address the merits or other requirements for an injunction. See Hohe v. Casey, 868 F.2d 69, 70-73 (3d Cir. 1989).