UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

COMMSCOPE, INC.,                    .
                                   .
        Plaintiffs,                .
                                   . Case No. 19-cv-15962
vs.                                .
                                   . Newark, New Jersey
ROSENBERGER TECHNOLOGY             . January 25, 2024
KUNSHAN CO., LTD., et al.,         .
                                   .
        Defendants.                .


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

This transcript has been reviewed and revised in accordance
with L. Civ. R. 52.1.

This transcript has been **REDACTED (AVAILABLE FOR ALL PARTIES
AND THE PUBLIC)** pursuant to Loc. Civ. R. 5.3(c)(2).


APPEARANCES (the parties appeared in person):

For the Plaintiffs:    EDWARD SPONZILLI, ESQ.
                       Norris McLaughlin, PA
                       400 Crossing Boulevard, 8th Floor
                       PO Box 5933
                       Bridgewater, NJ 08807-5933
                       (908) 722-0700
                       egsponzilli@norris-law.com




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES, LLC
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   (APPEARANCES continued)

 2   For the Plaintiffs:      HARMONY A. MAPPES, ESQ.
                              Faegre Drinker Biddle & Reath LLP
 3                            300 N. Meridian Street
                              Suite 2500
 4                            Indianapolis, Indiana 46204
                              (317) 237-8246
 5                            harmony.mappes@faegredrinker.com

 6                            ANNA E. SALLSTROM, ESQ.
                              Faegre Baker Daniels LLP
 7                            2200 Wells Fargo Center
                              90 S. Seventh Street
 8                            Minneapolis, Minnesota 55402
                              (612) 766 7614
 9                            anna.sallstrom@FaegreBD.com

10                            RANDALL KAHNKE, ESQ.
                              Faegre Drinker Biddle & Reath LLP
11                            2200 Wells Fargo Center
                              90 South Seventh Street
12                            Minneapolis, Minnesota 55402,
                              (612) 766-7658
13                            randall.kahnke@faegredrinker.com

14                            TRACEY SALMON-SMITH, ESQ.
                              Faegre Drinker Biddle & Reath LLP
15                            600 Campus Drive
                              Florham Park, New Jersey 07932
16                            (973) 549-7038
                              Tracey.salmonsmith@faegredrinker.com
17
                              BRYAN K. WASHBURN, ESQ.
18                            Faegre Baker Daniels LLP
                              2200 Wells Fargo Center
19                            90 S. Seventh Street
                              Minneapolis, Minnesota 55402
20                            (612) 766-8014
                              Bryan.washburn@faegredrinker.com
21
22   For the Defendants:      DANIEL SETH EICHHORN
                              Cullen and Dykman LLP
23                            433 Hackensack Avenue
                              Hackensack, NJ 07601
24                            (201) 488-1300
                              deichhorn@cullenanddykman.com
25
```

```
 1   (APPEARANCES continued)

 2   For the Defendants:     NICHOLAS PELLEGRINO, ESQ.
                             King & Wood Mallesons
 3                           500 Fifth Avenue, 50th Floor
                             New York, NY 10110
 4
                             VINCENT FILARDO, JR., ESQ.
 5                           King & Wood Mallesons
                             500 Fifth Avenue, 50th Floor
 6                           New York, NY 10110
                             (212) 319-4755
 7                           Vincent.filardo@us.kwm.com

 8                           DANIEL MILLER, ESQ.
                             King & Wood Mallesons
 9                           500 Fifth Avenue, 50th Floor
                             New York, NY 10110
10                           (212) 319-4755
                             daniel.miller@us.kwm.com
11
                             ANDREW SKLAR, ESQ.
12                           King & Wood Mallesons

13                           YI HE, ESQ.
                             King & Wood Mallesons
14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3                                                    **Page**

4      Proceedings                                    5

5      The Court's ruling on Issue 1:  Yang, Linfeng  18
6      document production

7      The Court's ruling on Issue 2:  Production of HR  36
       information
8
       The Court's ruling on Issue 3:  Satimo Macro    50
9      Generator

10     The Court's ruling on Issue 4:  No decision      53
       rendered
11
       The Court's ruling on Issue 5:  Data breach      70
12     information

13     The Court's ruling Issue 6:  Production of        93
       PowerShell script
14
       The Court's ruling on Issue 7:  Deposition       98
15     Testimony of Bisiules

16

17

18

19

20

21

22

23

24

25

1          (Commencement of proceedings)

2          THE COURT:  Okay.  We are on the record in

3  CommScope Inc., et al., versus Rosenberger Technology, et

4  al., 19-cv-15962.

5          I am Magistrate Judge Wettre.  We're here for oral

6  argument on discovery disputes.

7          And may I have appearances, please, starting with

8  the plaintiffs.

9          MR. SPONZILLI:  Thank Your Honor.  Edward Sponzilli

10  of the law firm Norris McLaughlin.  We're local counsel to

11  the plaintiffs.

12          THE COURT:  Good afternoon, Mr. Sponzilli.

13          MS. SALMON-SMITH:  Good morning, Your Honor.

14  Tracey Salmon-Smith.  I'm with Faegre Drinker Biddle & Reath

15  here in New Jersey.

16          THE COURT:  Good afternoon.

17          MS. MAPPES:  Harmony Mappes, Your Honor.  Also with

18  Faegre.

19          THE COURT:  Good afternoon to you.

20          MR. KAHNKE:  Randy Kahnke, Your Honor.  Also with

21  Faegre.

22          THE COURT:  Good afternoon.

23          MR. KAHNKE:  Good afternoon.

24          THE COURT:  And --

25          MS. SALLSTROM:  Anna Sallstrom with Faegre.

 1                THE COURT:  Okay.

 2                MR. WASHBURN:  Bryan Washburn also with Faegre.

 3                THE COURT:  Okay.  Welcome.  And if you'd rather

 4   sit in the jury box, that's okay too.  If you want to be

 5   closer to your co-counsel.  It doesn't matter to me.  Yeah,

 6   we short-changed you on the table, I see.

 7                All right.  And for defendants?

 8                MR. EICHHORN:  Your Honor, Daniel Eichhorn from

 9   Cullen and Dykman.  I'm local counsel.

10                THE COURT:  Okay.  Good afternoon.

11                MR. MILLER:  Daniel Miller from King & Wood

12   Mallesons.

13                THE COURT:  Good afternoon.

14                MS. HE:  Good afternoon.  Yi He, also with King &

15   Wood Mallesons.

16                THE COURT:  Good afternoon.

17                MR. SKLAR:  Andrew Sklar from King Wood Mallesons.

18                THE COURT:  Okay.  Good afternoon.

19                MR. PELLEGRINO:  Nick Pellegrino from King Wood &

20   Mallesons.

21                THE COURT:  Good afternoon.

22                MR. FILARDO:  Good afternoon, Your Honor.  Vincent

23   Filardo Jr. from King Wood Mallesons.

24                THE COURT:  Okay.  Good afternoon to you.

25                All right, everyone.

1          So just for the record, I'll just state the docket

2   numbers of the joint submissions I received on discovery.  I

3   have before me ECF 562 and ECF 566.  I also have two books of

4   exhibits that correspond to each of the letters.  And I just

5   wanted to let you know I have thoroughly read everything more

6   than once, and digested it.  So you can save time in going

7   through basics.  You do not have a cold bench today or an

8   unprepared one.

9          So what I've done in all honesty is I've taken the

10  issues and I've mapped out an oral opinion after considering

11  and reconsidering and looking at cases.

12          That said, I do keep an open mind for oral

13  argument; otherwise, I wouldn't bother dragging you in here.

14  So I'll have you argue each issue.  I'm figuring -- it has to

15  be a short amount of time per issue -- maybe five minutes, go

16  to the heart of it and don't waste time on the edges.

17          And then I will take a look silently at my oral

18  opinion and see if I want to modify it based upon what I've

19  heard.  I will likely ask you some questions; more on some

20  issues than others.

21          And then, you know, we can certainly take a break

22  or two -- I'll probably need one and just to give you all a

23  break.

24          I was in the Supreme Court watching argument on the

25  Chevron issue last week -- I think it was last week and not

1  the week before.  And Justice Thomas had to take a break, and

2  Chief Justice Roberts didn't even stop for him.  They went

3  for two hours and 15 minutes, and I thought, boy, I'd like to

4  get up and leave like Justice Thomas.

5         So I won't do that to you today.

6         All right.  So that said, I'm going to take the

7  issues in the order in which you submitted them.  So we'll

8  start with, you know, the one meatily briefed issue in

9  ECF 562.  It is really CommScope's "ask," if you will; so

10  I'll hear from CommScope on that first issue for about five

11  minutes, and then turn it over to Rosenberger.

12         MS. MAPPES:  Thank you, Your Honor.

13         THE COURT:  And, Ms. Mappes, wherever you're

14  comfortable.  I am not offended if you stay at counsel table.

15  You can come up to the podium.  I'm sorry that I don't have a

16  shelf for you.

17         MS. MAPPES:  I'll come up, Your Honor.  That will

18  be just fine.

19         THE COURT:  All right.  Very good.

20         MS. MAPPES:  One quick housekeeping note, we

21  typically have sealed --

22         THE COURT:  Yes, thank you.  Thank you.  I had it

23  right on the top of my notes.

24         MS. MAPPES:  So did I.

25         THE COURT:  So everyone in the courtroom now -- and

1   I'll ask counsel to look around -- is privy to all of the

2   information marked confidential and highly confidential under

3   the confidentiality order?

4           MS. MAPPES:  Yes, Your Honor.

5           THE COURT:  I see a lot of nodding heads.  Okay.

6           So I'm going to seal not only the record but the

7   courtroom because this hearing will discuss extensive

8   information of the parties that was marked confidential or

9   highly confidential pursuant to the confidentiality order

10  that the Court entered.

11          So rather than formally locking the door, just you

12  all keep an eye on the door, and if somebody wanders in who

13  you don't know to be privy to confidential information, just

14  give me a wave.  Okay?

15          MS. MAPPES:  Thank you, Judge.

16          THE COURT:  Go ahead, Ms. Mappes.

17          MS. MAPPES:  Good afternoon, and may it please the

18  Court.  I'm Harmony Mappes for CommScope on Issue Number 1.

19          Production of CommScope's BSA component design

20  files is core foundational discovery that was to be done and

21  that was ordered at the very outset of discovery, yet

22  CommScope learned for the first time in depositions ████████

23  ████████████████████████████████████████  ████████████████

24  ██████████████████████████████████████████████████████████

25  ██████████████████████████████████████████████.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



 8          And, of course, these employees can have no privacy

 9    interests in CommScope's trade secret information, which is

10    all CommScope is seeking from these devices.  As the case law

11    we rely on explains, an employer should not be able to shield

12    itself from discovery by claiming it has no control over

13    work-related materials on an employee's personal account or

14    device.  Such a rule could have the potential to incentivize

15    employers to require the use of personal accounts for

16    business purposes.  And this would cut against the federal

17    rules which allow for broad discovery and would inhibit the

18    resolution of cases on their merits.

19          These sorts of perverse incentives are acute in a

20    case like this, Your Honor, where if Rosenberger is allowed

21    to shield these documents,

22

23

24    .  That cannot

25    be how this works.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1          I'd also like to address the cost-shifting

2    argument, Your Honor. ████████████████████████████

3    ███████████████████████████████████████████

4    ███████████████████████████ but only if CommScope

5    pays the cost of restoring, searching, and hosting the data.

6    Had Rosenberger searched for and produced these documents

7    during the course of document discovery, as they, through

8    their prior counsel, represented to us and to the Court that

9    they would do, these costs would not even exist.

10          I would also direct your attention to Exhibit 26;

11    it's the last exhibit.  This is a quote from Rosenberger's

12    e-discovery vendor, and it says -- and I'll just quote one

13    sentence, Your Honor --

14          THE COURT:  Just let me catch up with you.

15          MS. MAPPES:  Absolutely.

16          THE COURT:  Okay.

17          MS. MAPPES:  And I'll quote the sentence,

18    Your Honor, just the one-page document ████████████████

19    ███████████████████████████████████████

20    ███████████████████████████████████.  End

21    quote.

22          Yet Rosenberger is asking for ████████████████

23    █████████████████████████████████████████████

24    ████████.  Rosenberger cannot meet its burden here to shift

25    these costs to CommScope.

1          In sum, we respectfully request that the Court

2    order Rosenberger to produce CommScope's trade secret design

3    files regardless of where they were stored.  CommScope also

4    requests additional deposition time to address these issues.

5          I'm happy to answer any questions, of course, but

6    I'll leave it there.

7          THE COURT:  Okay.  Thank you, Ms. Mappes.

8          I have no questions.

9          MS. MAPPES:  All right.

10          MR. FILARDO:  Good afternoon, Your Honor.  Vincent

11    Filardo from King and Wood Mallesons.

12          Briefly, I'd like to first address the issues

13    related to Mr. Yang and his computer, and then I'll address

14    the issues related to Sheng Linfeng.  And that's the employee

15    who would need to have his data restored in order to search

16    it.

17          So with respect to Mr. Yang, Your Honor, to the

18    extent there are any CommScope documents on his personal

19    laptop, that would have occurred while he was an employee at

20    CommScope.  There is nothing in the record and we have found

21    no evidence that suggests he ever used that laptop while he

22    was at Rosenberger.  And, indeed, he was issued a Rosenberger

23    laptop and also worked at a Rosenberger workstation.

24          And those documents have all been searched, and all

25    responsive documents --

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

13

1        THE COURT:  Can I stop you for a moment.

2        MR. FILARDO:  Sure.

3 

4

5

6

7

8

9

10

11 ███████████  So he has a laptop at Rosenberger that was

12   issued to him.  He has a workstation, and he has his own

13   email files at the company.  Those were all searched, and all

14   responsive documents related to them were produced, including

15   any documents that were CommScope -- originated CommScope

16   documents.  That was all produced.  And that's clearly the

17   best -- the best location to determine where any CommScope

18   documents would be if Rosenberger had them in their

19   possession.

20        So that is the issue -- one of the main issues here

21   is that we have searched for them.  We did not ignore them.

22

23

24                                                              .

25        THE COURT:  Okay.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1          MR. FILARDO:  Now, the issue arises again whether

2    or not we have that kind of access to his laptop.  And even

3    the cases that CommScope cites to -- I think it's the In re

4    Skanska case, which is a Northern District of Florida case,

5    and that case was rather aggressive in allowing a personal

6    device of an employee to be accessible.  Even the court there

7    found that it didn't require the company to actually search

8    that device.  It required the company to ask the employee to

9    search it so as to leave no doubt that there would not be any

10   access to personal information and private information.

11         But I don't think the Court needs to go that far

12   here, Judge, because we've looked at the stuff that Mr. Yang

13   had brought to CommScope -- and Rosenberger.  And that's been

14   produced to CommScope.

15   ███████████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████

20         THE COURT:  Where is that?

21         MR. FILARDO:  That is not -- that is not produced

22   to the Court, Your Honor.  That has not been produced.  This

23   is in the record, though.

24         Essentially they ask -- ████████████████████

25   ██████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    ███████.

2          THE COURT:  When was this interrogatory answered

3    ████████████████████████████████████████████████████████

4    ████████████?

5          MR. FILARDO:  Interrogatory -- the verification is

6    dated January 24, 2020.  The actual responses and objections

7    are dated January 17, 2020.  ████████████████████████████

8                  ████████████████████████████████████████████

9    ██████████████████████████████████████████████ --

10         THE COURT:  Is that in your submission?

11         MR. FILARDO:  They aren't, Your Honor.  These --

12         THE COURT:  They are or aren't?

13         MR. FILARDO:  They are not.  These are --

14         THE COURT:  Are they referenced in 562, the joint

15   dispute letter?

16         MR. FILARDO:  They are not, Your Honor.  These are

17   issues that we discovered after our submissions to

18   determine -- you know, in response to some of the assertions

19   that were made in reply in the joint submission.

20         So he was identified in that document as well as an

21   ██████████████████████████████████.

22         And, moreover, Your Honor, I think more --

23         THE COURT:  Was he identified in the negotiations

24   of the ESI order that was entered in January 2021 as a person

25   who should be a custodian for those searches?

1              MR. FILARDO:  He was also identified in that too.

2    In CommScope --

3              THE COURT:  Why didn't you put it in your

4    submission?

5              MR. FILARDO:  Your Honor --

6              THE COURT:  I prepared many hours for this.  And

7    now I'm hearing new information while you're on your feet?

8              MR. FILARDO:  I apologize for that, Your Honor.

9    But I think the issue was more that since we were willing to

10   try to agree with CommScope to produce the stuff if they

11   would shift the cost, that it wouldn't be necessary to burden

12   the Court with that.

13             But after their reply came in where they made

14   several assertions that they didn't know about this guy, I

15   thought it was appropriate for us to identify this to the

16   Court.

17             THE COURT:  Okay.

18             MR. FILARDO:  And I think -- I think more important

19   than even the interrogatories and the letter from Milbank is

20   that when the parties were negotiating the custodian list,

21   CommScope had in their proposed custodian list identified

22   Mr. Sheng Linfeng as one of, I think, 55 custodians at the

23   time.  He was Number 36.

24             Ultimately, the parties agreed to a smaller subset

25   of that, and he was not in that subset.  He was taken out by

|Hearing
|19-cv-15962, January 25, 2024                                    17
|REDACTED (available for all parties and the public)

1    CommScope.

2           So when it came to this Court and Your Honor I

3    believe there were -- I think it was 21 that we could agree

4    on and then another 14 that CommScope wanted for a total of

5    35 and then ultimately Your Honor allowed another seven, so a

6    total of 28.

7           And even in those 14 that CommScope had requested

8    from the Court, they didn't request Mr. Sheng Linfeng.  He

9    was taken out from their original custodian list.

10          So I am -- was taken aback by some of the

11   assertions that they didn't know about him and that we were

12   unwilling to -- that we should have --

13          THE COURT:  Well, you ought to have put that in

14   your submission if you were taken aback.

15          MR. FILARDO:  It was after the fact that I saw the

16   reply.

17          THE COURT:  Thank you.

18          Ms. Mappes, will you respond to that?  Just the

19   point about Linfeng, ███████████████████████████████████████

20   ███████████████████████████████████████████████████.

21          MS. MAPPES:  Yes, Your Honor.  ███████████████████

22   ███████████████████████████████████████ does not make any

23   difference.  Everybody understood at the time -- indeed,

24   according to Rosenberger's prior counsel, targeted

25   collections were going to happen to get design files

1    regardless because they're not susceptible to search terms.

2             As Your Honor knows, we had lot of back-and-forth;

3    we had multiple hearings about this.  And part of the reason

4    we could take some of those custodians off the list was

5    because Rosenberger's prior counsel represented, "We are

6    doing targeted collections.  We understand that design files

7    do not always show up in searches."

8             And we fully understood that they were collecting

9    all of our design files regardless of where they were.

10            THE COURT:  Okay.  All right.  Thank you.

11            Please sit down.

12            Let me just go through my notes on this.

13         (Pause in proceedings)

14            THE COURT:  Okay.  Before the Court are several

15   discovery disputes briefed by the parties prior to this

16   hearing at ECF Numbers 562 and 566.

17            I have just heard oral argument on the first issue,

18   which was presented in ECF 562.  I am ready to issue my

19   ruling on that.

20            But, first, a brief bit of background.

21            This is an action in which CommScope contends that

22   its trade secrets concerning base station antennas were

23   misappropriated by defendants, who are competitors in the BSA

24   market, in violation of several statutes.  See the Amended

25   Complaint at ECF 50.  I will jointly refer to the defendants

1    as "Rosenberger."

2         A primary way in which CommScope contends trade

3    secrets were misappropriated by Rosenberger is through former

4    CommScope employees who brought the alleged trade secrets to

5    Rosenberger when they subsequently became employed there.

6    See ECF 50, paragraphs 47 to 52.

7         The Court has been supervising discovery in this

8    action since 2019 and has had several lengthy hearings to

9    resolve disputes and, as such, is very familiar with the

10   issues in this action and the history of discovery.

11        Under the most recently entered case management

12   order pertaining to fact discovery, written discovery closed

13   April 27th, 2023, and even that period was provided solely

14   for supplementing written discovery, given the prior years of

15   document discovery that were afforded to the parties.  And

16   deposition discovery closed on November 17th, 2023.  See the

17   Case Management Order at ECF 530.

18        The first issue in dispute before the Court

19   concerns two of the former CommScope and now-Rosenberger

20   employees, Charles Yang and Sheng Linfeng.  CommScope seeks

21   an order compelling ███████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████

25   ██████.  CommScope further seeks, after production of such

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

20

1    information if it is ordered, Linfeng's deposition and an

2    additional deposition of Yang and/or additional time to

3    depose Rosenberger's 30(b)(6) witness concerning the newly

4    produced information.

5            The relevant factual background of the dispute is

6    this:



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1          First, the Court finds that the information sought

2   is relevant and proportional within the meaning of Rule 26.

3   The Court has previously held that Rosenberger's possession

4   of CommScope's design files is highly relevant to CommScope's

5   claims of trade secret misappropriation.  CommScope alleges

6   that much of the misappropriated information came through its

7   ex-employees subsequently becoming employed at Rosenberger,

8   ████████████████████████  ███████, and bringing CommScope

9   information with them, ██████████████████████████████████████

10  █████████████████████████.

11         Moreover, production of these CommScope design

12  files is proportional to the needs of the case.  All the

13  information sought is highly targeted, and even if resources

14  need to be expended to produce it, given the -- and I'm

15  paraphrasing the proportionality factors of Rule 26(b)(1) --

16  given the importance of the issues at stake in the action,

17  the amount in controversy, and the importance of the

18  discovery in resolving the issues, it is proportional within

19  the definition set forth in 26(b)(1).

20         Second, the Court finds that CommScope has met its

21  burden of demonstrating that the information on Yang and

22  Linfeng's personal devices is within Rosenberger's control,

23  even if not all of it is within its custody or possession

24  under Rule 34.  Control is defined -- and this is a quote --

25  "control is defined as the legal right, authority, or ability

1   to obtain documents upon demand."  <u>Camden Iron and Metal Inc.</u>

2   <u>v. Marubenii America Corp.</u>, 138 F.R.D. 438 at page 441, a

3   District of New Jersey opinion from 1991.

4            Federal courts have construed the definition of

5   "control" broadly under Federal Rule of Civil Procedure 34.

6   <u>See</u> <u>id.</u>

7   ███████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ███████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████

13  ████████████████████████████████.  <u>See</u> ECF 562 at 5.

14  Thus, it is an open question.

15    ███████████████████████████████████████

16  █████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ███████████████████████████████  <u>See</u> Exhibit 8.  Nothing in the

20  briefing from Rosenberger states that Yang has or would

21  refuse to provide the information from -- the CommScope

22  information upon his personal devices to Rosenberger, if

23  requested.  To the contrary, █████████████████████

24  ██████████████████████████████████████████████████

25  ███████████████.  <u>See</u> ECF 562 at 16.

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████

7  ████████████████████████████  This is so regardless of the

8  fact that the devices were not issued by Rosenberger.  See

9  matter of Skanska, 2021 WL 4953239 at *3, a Northern District

10 of Florida opinion from August 5, 2021, which says -- and I

11 quote:  "An employer has control of a current employee and

12 the legal right to obtain business communications from a

13 current employee regardless of whether the communication is

14 located on a personal cell phone."  See also Mirlis v. Greer,

15 80 F.4th 377 at page 382, a Second Circuit decision from

16 2023, holding that a lack of physical possession does not

17 denote a lack of control under Rule 34.

18       To that end, an employer may not shield itself in

19 potential litigation by "simply maintaining anything

20 potentially discoverable in an employee's personal email

21 account ...  Such evasive measures would cut against the

22 purpose of the federal civil rules that allow for broad

23 discovery."  And that is from State Farm v. Precious Physical

24 Therapy, 2020 WL 7056039 at *6, n.4, an Eastern District of

25 Michigan decision from December 2, 2020.

1    The Court therefore concludes that Rosenberger has

2    sufficient control over the specific and highly relevant

3    content that CommScope seeks and must produce it.

4

5

6

7

8    Accordingly, control is not at issue

9    here, and Rosenberger does not rely on any other basis beyond

10   the purported cost to resist producing what is clearly

11   discoverable information.

12        As for cost shifting, the Court will address this

13   in a little while.

14        Third, I do not find that CommScope waived any

15   right to seek this information.  In an effort not to unduly

16   burden Rosenberger in discovery, the Court cabined the scope

17   of the discovery available to CommScope early on, requiring

18   an iterative approach to searching Rosenberger's records for

19   allegedly misappropriated design files.  The Court repeatedly

20   assured the parties, in denying certain broad requests for

21   discovery, that as discovery unfolded and revealed additional

22   potential sources of information, the Court would allow

23   discovery to be expanded to those areas accordingly and in a

24   targeted manner.

25        That is exactly what occurred here where CommScope

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

25

1  learned at depositions in the fall of 2023 that ███████

2  ████████████████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  ███████.  The Court rejects Rosenberger's arguments that

6  CommScope slept on its rights.

7          To the extent that Rosenberger argues that

8  CommScope should have found through its own servers that Yang

9  and Linfeng sent the files to their personal devices while

10 they were still CommScope employees, the Court finds this

11 argument ignores that CommScope had deleted those employees'

12 email accounts in the ordinary course of business before this

13 litigation commenced.

14         The Court therefore orders Rosenberger to produce

15 all CommScope design files of Linfeng in its possession and

16 that are found on Yang's and Linfeng's personal devices.

17         Finally, the Court rejects Rosenberger's request to

18 shift costs of this production onto CommScope.  The

19 presumptive rule is that parties pay for their own production

20 of information.  Cost-shifting is appropriate only for

21 inaccessible data, which archived data is not considered to

22 be.  See Juster Acquisition Company v. North Hudson Sewerage

23 Authority, 2013 WL 541972 at *3, a District of New Jersey

24 decision from February 11, 2013.  And even if the data were

25 considered inaccessible, the fact that Rosenberger rendered

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

 1   it inaccessible by archiving information it knew to be

 2   directly relevant and responsive to CommScope's discovery

 3   requests during discovery in this action is on Rosenberger.

 4   Rosenberger's decision to take highly relevant information

 5   and make it time-consuming and expensive to retrieve was its

 6   own erroneous judgment, and CommScope should not literally

 7   have to pay the price for it.

 8          CommScope may also depose Yang and Linfeng and/or

 9   Rosenberger's 30(b)(6) designee about the design files after

10   they are produced.

11          I will not prejudge how much time CommScope is

12   allotted as we do not yet know the extent of the information

13   that will be produced.  The parties are to meet and confer

14   about that at the appropriate time after the documents or

15   electronically stored information is produced.

16          Okay.

17          Let's go to Issue 2.  It's a CommScope "ask," so

18   CommScope may argue it first.

19          MR. WASHBURN:  Good afternoon, Your Honor.  Bryan

20   Washburn from Faegre Drinker on behalf of CommScope.

21          Issue Number 2 is asking the Court to issue an

22   order directing Rosenberger to produce its HR investigation

23   and subsequent disciplinary records for its employees ████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████.  That investigation conducted

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



1

2

3

4

5

6

7

8          Rosenberger's argument that the information is not

9    responsive to a particular RFP is also incorrect.  We've

10   identified a series of RFPs that it would be responsive to,

11   most particularly RFP Number 17, which even defendants

12   concede

13

14                .

15          That's what we have here.

16

17

18                .

19          Rosenberger's other arguments to prevent producing

20   the information are meritless.  Their argument that the

21   information is -- there's privacy rights or -- go ahead.

22          THE COURT:  Let me ask you, what's the relevance of

23   this information?

24          MR. WASHBURN:  The information is relevant both to

25   show misappropriation --

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)





10    THE COURT:  Understood.

11    MR. WASHBURN:  Okay.

12    THE COURT:  Thank you.  You can -- last word.

13    MR. WASHBURN:  Nothing further, Your Honor, unless

14 you have other questions.

15    THE COURT:  Okay.  No.

16    MR. WASHBURN:  Thank you so much.

17    THE COURT:  Thank you.

18    All right.  Who's got this one?

19    Please just repeat your name for the record.

20    MS. HE:  Hi, Your Honor.  Yi He on behalf of the

21 defendants.

22    THE COURT:  Okay.  Please spell it for the court

23 reporter, or they'll be back to me asking.

24    MS. HE:  Of course.  First name, Y-i.  Last name,

25 H-e.

1          On behalf of defendants to argue Issue Number 2,

2     the requests made by the plaintiffs are not relevant nor

3     proportional to the needs of this case in light of all the

4     discovery the parties have had over the years.  And more

5     importantly, it intrudes upon the privacy interests of the

6     employees.

7          At no --

8          THE COURT:  What if we redacted the names -- you

9     redacted initially the names of the employees?  Or -- I'm

10    sorry.  That wouldn't help CommScope identify ███████████

11    ███████████████████.

12         If it was stamped as confidential pursuant to the

13    confidentiality order and only the lawyers in this case could

14    see the ██████████████████████████████████████████

15    ████████████████████████████████████████████████████████

16    ███████████████?

17         MS. HE:  Respectfully, no, Your Honor.  The reason

18    is because, first of all, at nowhere during the 30(b)(6)

19    deposition ████████████████████████████████████████████

20    ████████████████████████████████████

21              ███████████████████████████████████████████

22    ████████████████████████████ --

23         THE COURT:  Tell me where it is so I can follow

24    along.

25         MS. HE:  Of course.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1               THE COURT:  By Bates stamp?

2               MS. HE:  It's in the deposition of this 30(b)(6)

3    witness.  It's on page 452.  And I'm looking at lines 10 to

4    13.

5               THE COURT:  Sorry.  Which exhibit?

6               MS. HE:  It's Exhibit AA to the --

7               THE COURT:  AA?

8               MS. HE:  Yes.

9               THE COURT:  Okay.  Give me a second.

10              MS. HE:  I'm sorry, Your Honor.  It's Exhibit A.

11              THE COURT:  Exhibit A.

12              And tell me again the page?

13              MS. HE:  It's page 452.  And I'm looking at

14   lines 10 to 13.

15              THE COURT:  Okay.

16              MS. HE:  ████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

34



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    ████████████████████████████████████

2            THE COURT:  Okay.  I understand your argument.

3    Thank you.

4            MS. HE:  Thank Your Honor.

5            THE COURT:  Mr. Washburn, just briefly, yeah.

6            MR. WASHBURN:  Brief, Your Honor.  Thank you.

7            Your Honor, I just want to make a few points.

8            What I heard from Ms. He's argument is they're no

9    longer arguing the information isn't responsive to a

10   particular discovery request.  They're relying solely on

11   relevancy.

12           As I explained in my argument, the information is

13   relevant ████████████████████████████████

14   ██████████████████

15       ██████████████████████████████████████

16   ███████████████████████████████████████████

17   █████████████████████████████████████████

18   ███████████████████████████████████████

19   ███████████████████████████████████████████

20   ███████████████████

21           THE COURT:  Okay.

22           MR. WASHBURN:  Thank you for your time.

23           THE COURT:  Thank you.

24           There were a number of different answers because

25   different entities were named.  I did look at affirmative

1    defenses in some of the answers.

2              Is it the same affirmative defense across all the

3    Rosenberger answers --

4              MR. WASHBURN:  This is for the main three

5    affirmative -- main three defendants.  I believe it's

6    Docket 462, and it's the fifteenth affirmative defense.

7              THE COURT:  Which went to its -- ████████████████

8    ██████████████.

9              MR. WASHBURN:  ██████████████████████████████████

10   ███████████████████████████████████

11             THE COURT:  All right.  Give me a moment, please.

12             MR. WASHBURN:  Thank you, Your Honor.

13        (Pause in proceedings)

14                    ████████████████████████████████████████

15   ███████████████████████████████████████

16   ██████████████████████████████████████

17   ██████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████████████████████

20           █████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████████

23   ██████████████████████████

24           ███████████████████████████████████████

25   ██████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)





 1 

 2 

 3 

 4 

 5 

 6 

 7 

 8 

 9          Rosenberger shall produce this information as

10     requested.

11          All right.  Issue 3.

12          CommScope's again.

13          MS. SALLSTROM:  Thank you, Your Honor.  This is

14     Anna Sallstrom of Faegre.  I'm here on behalf of CommScope,

15     and I'll address Issue Number 3, which relates to Satimo

16     Macro Generator.

17          And I'll preview that, as we've alerted the other

18     side, I have additional information to share that makes it

19     clear that 

20     .

21          THE COURT:  What do you mean additional

22     information?  Not in the written submissions?

23          MS. SALLSTROM:  That's correct, Your Honor.

24          THE COURT:  Why am I getting things not briefed

25     after I spent copious amounts of time studying 150 pages of

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1  submissions?

2              MS. SALLSTROM:  Your Honor, we --

3              THE COURT:  Just the submissions.

4              MS. SALLSTROM:  Yes, Your Honor.  So in this

5  particular instance, we certainly appreciate the time and

6  effort that Court has put into reviewing the parties'

7  submissions, which I know were extensive.

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████████████████████████████████████████

12             THE COURT:  Have you shown it to your adversary?

13             MS. SALLSTROM:  Yes, Your Honor.  We advised them

14 of this last week, sent a letter expressing that we intended

15 to raise it with the Court today.

16             THE COURT:  Okay.

17             Do you have a copy for the Court?

18             MS. SALLSTROM:  Yes, I do, Your Honor.

19             THE COURT:  Thanks, Lorraine.

20             Okay.  Just for the record, I have before me a

21 multiple-page document -- in fact, it's about half an inch

22 thick -- which is Bates-stamped starting with Rosen 00455600

23 and it goes -- looks like consecutively -- well, counsel will

24 correct me if I am wrong -- it goes consecutively through

25 Bates-stamped page Rosen 00455634, and then there is a

1    one-page attachment entitled "Certificate of Accuracy" to

2    certify that it's a true translation from Chinese into

3    English.

4                Okay.  Proceed.  Thank you.

5                MS. SALLSTROM:  Thank you, Your Honor.

6                So as Your Honor knows, Satimo Macro Generator is

7    one of the CommScope trade secret software programs at issue

8    in this case.  It's been part of the case from the beginning,

9    and since the beginning we've sought discovery into whether

10   Rosenberger had and used it.  They have denied for years that

11   they had the program.

12   ████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ██████████

16   ████████████████████████████████████████████████████████

17   ██████████████████████████████████████████

18                THE COURT:  ██████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████

24   ██████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1  ███████████████████████████████████████████████

2  ████████████

3         THE COURT:  How so?

4         MS. SALLSTROM:  Yes.  So as you've noticed, it's a

5  certified translation.  If you turn to the blue tab, that is

6  the first page of the English portion of the document.

7         THE COURT:  Okay.  And the Bates number for the

8  record is 455600.

9         MS. SALLSTROM:  And so on that page you'll see that

10 I've highlighted some relevant language.  ████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ███████████████████████████████

16         So if you could please turn to the red tab.

17         THE COURT:  Okay.

18         And for the record, that's Bates-stamped 455613.

19         MS. SALLSTROM:  In the middle of the page here,

20 which I've highlighted for your convenience, there's the

21 ███████████████████████████████████████████████

22 ███████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    ███████████

2            THE COURT:  Okay.

3            MS. SALLSTROM:  And so if you'll flip through from

4    the red tab to the yellow.

5            THE COURT:  Let me interrupt you.

6            Is Rosenberger, based upon this document, still

7    declining to produce what CommScope has requested,

8    Mr. Filardo?

9            MS. SALLSTROM:  Your Honor, we --

10            THE COURT:  Just a minute.

11            MR. PELLEGRINO:  Yes, Your Honor.

12            THE COURT:  You're still declining to produce it?

13            MR. PELLEGRINO:  Produce?

14            THE COURT:  Produce what they requested about the

15    ███████████████████████████.

16            MR. PELLEGRINO:  The request doesn't actually seek

17    any documents.  It asks for us to produce a witness ████

18    ███████████████████████████████ --

19            THE COURT:  Right.  And you said there's no

20    foundation ███████████████, based upon your witness --

21    your reinterpretation of his testimony.

22            MR. PELLEGRINO:  Of the witness's testimony.

23            THE COURT:  You're going to continue to resist

24    this?

25            MR. FILARDO:  To produce the witness?  Yes,

1    Your Honor.

2          THE COURT:  All right.

3          Go on.

4          MS. SALLSTROM:  So I won't belabor the document,

5    but if you'll flip through from the red tab to the yellow,

6    you'll see that ████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ████████████████████████████████████████████.

12         THE COURT:  Okay.  You may be seated.  Thank you.

13         MR. PELLEGRINO:  Good afternoon, Your Honor.  Nick

14   Pellegrino from KWM on behalf of defendants.

15         As I just stated, what's been requested here is

16   that defendants be ordered to produce a witness regarding

17   ██████████████████████████████████████████████████████

18   █████████████████.  This has already been done.  Defendants

19   produced a 30(b)(6) witness to testify on this topic.  He was

20   deposed over four days for 26 hours of translated testimony.

21   Plaintiffs could have asked all the questions that they

22   wanted, but they decidedly chose not to.  They waited until

23   the very end of the deposition after 25 hours and 59 minutes

24   to ask a single question on the topic.

25         Following that, Rosenberger produced a second

1  30(b)(6) witness a month and a half later.  That witness was

2  deposed for 14 hours.  Plaintiffs still chose not to --





6    THE COURT:  Okay.  Stick to what's in your

7  submission, please.

8    MR. PELLEGRINO:  Understood, Your Honor.

9    As I was saying, there were multiple witnesses that

10  have been deposed on this topic -- that have been deposed on

11  this topic.  Plaintiffs decidedly chose not to ask any

12  questions --



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    ████████████████████ --

2              THE COURT:  I have the original.

3              Where's the errata?  What does the errata say?  Is

4    it in the submissions?

5              MR. PELLEGRINO:  The errata is not because it was

6    submitted after the fact.

7              THE COURT:  Okay.

8              MR. PELLEGRINO:  After the submission.

9              THE COURT:  Yeah, I understand.  Please read it to

10   me.  What is the recast of the testimony?

11             MR. PELLEGRINO:  Let me get the declaration.  One

12   moment, Your Honor.

13             THE COURT:  Okay.

14        (Pause in proceedings)

15             THE COURT:  Thank you.

16             Okay.  I have the errata.  I understand.

17   ███████████████████████████████████████████████████

18   ██████████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   █████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████

24   █████████████████████████████████████████████

25   ████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024                                    49
|REDACTED (available for all parties and the public)



1

2

3

4

5

6

7

8

9          Okay.  I have it.

10         All right.  Why don't you finish up?

11         MR. PELLEGRINO:  Yeah, I'm just -- one second,

12    Your Honor.

13

14

15

16

17

18

19

20

21

22

23

24    --

25         THE COURT:  By Rosenberger.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1        MR. PELLEGRINO:  I'm sorry?

2        THE COURT:  Produced by Rosenberger.

3        MR. PELLEGRINO:  Yes, Your Honor.

4        THE COURT:  Okay.  Thank you.

5        MR. PELLEGRINO:  Thank you.

6     (Pause in proceedings)

7        THE COURT:  Go ahead, Ms. Sallstrom.

8        Just keep it brief.

9        MS. SALLSTROM:  Yes, Your Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22        THE COURT:  Okay.

23        MS. SALLSTROM:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25        Okay.  On the third issue, CommScope seeks



1  Rosenberger to be ordered to produce a

2

3

4

5          This software program is mentioned specifically in

6  at least the amended complaint, probably the original

7  version, and has been the subject of discovery since

8  discovery's commencement years ago.

9

10

11

12

13

14

15

16

17                                                        And

18  that's from Exhibit F at 497.

19          Rosenberger does not dispute that the information

20  is relevant.  It does argue that further discovery would be

21  disproportional given how much discovery CommScope has taken

22  in general.

23          But the Court does not agree as this is a discrete

24  issue that only arose at the recent deposition.

25  Rosenberger's main opposition to CommScope's application is

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



1    In any event, there is at minimum an ambiguity on a

2    relevant issue that needs to be cleared up, and CommScope may

3    do so at a further deposition.

4    All right. One further thing, and then we're going

5    to take a short break. On Issue 4 ███████████████████

6    ██████████████████, Rosenberger was not objecting to

7    producing what exists. Therefore, I did not spend time

8    preparing on this issue. It looked like it was in the middle

9    of a meet-and-confer. I prepared plenty on everything else.

10   But I don't do it on things that "may" be in dispute.

11   So if this landed as a definite dispute, you're

12   going to have to submit it with where it landed. I am not

13   going to hear that.

14   You can give me an update, if you like.

15   MALE SPEAKER: Who would you like to go first,

16   Your Honor?

17   THE COURT: Go ahead, Mr. Washburn.

18   MR. WASHBURN: Thank you, Your Honor. Just

19   briefly, and, again, we appreciate the Court's time.

20   Again, this is Bryan Washburn on behalf of

21   CommScope.

22   To give the Court an update on where we are, we

23   learned for the first time in 30(b)(6) testimony in Hong

24   Kong, █████████████████████████████████████████████████████

25   █████████████████████████. That information should have

1   been produced before depositions.  We're now four months

2   removed from that deposition testimony.  We obtained on

3   Friday the first production, and much of the information that

4   their 30(b)(6) identified as existing was not produced.

5           We asked where it was.  All defendants could tell

6   us is they're still conferring with their client.

7           We think an order directing them to produce the

8   documents related to RFP 111 would -- is necessary, given the

9   amount of time that's passed since the deposition testimony

10  and the information's still not produced.

11          THE COURT:  All right.  But there's not a dispute

12  as to relevance.  I agree that there should be a commitment

13  because we're on -- we're long past fact discovery.

14          But why don't you continue that?  If you're not

15  satisfied with their commitments to a date certain, then you

16  can come back to me.

17          MR. WASHBURN:  Fair enough.  Thank you, Your Honor.

18          THE COURT:  Okay.

19          Is there anything Rosenberger wishes to say on

20  that?

21          ATTORNEY FOR DEFENDANTS:  Are you asking that we

22  meet and confer with them afterwards to come up with a date

23  certain?

24          THE COURT:  Whatever they're seeking.  There should

25  be certainty.  If you're going to produce it, they should

 1  know when the end date is.  They're trying to plan -- there's

 2  going to be some re-depositions, and they probably want to

 3  know before that.

 4          ATTORNEY FOR DEFENDANTS:  Yeah, absolutely,

 5  Your Honor.  We've already produced, I think, over 150 to 200

 6  documents ████████████████████████████████████████████

 7  ███████████████████████████████████████████████

 8  ████████████████████████████ --

 9          THE COURT:  Okay.  I don't need the details.

10          ATTORNEY FOR DEFENDANTS:  Understood, Your Honor.

11          THE COURT:  Conclude it.

12          ATTORNEY FOR DEFENDANTS:  Happy to confer with them

13  on a date certain.

14          THE COURT:  All right.  Let's take a 5-minute

15  break.  Thank you.

16     (Recess)

17          THE COURT OFFICER:  You're back on the record,

18  Judge.

19          THE COURT:  All right.  We are continuing with the

20  CommScope hearing, and we are up to Issue 5, which is

21  something that Rosenberger is seeking; so they should go

22  first, please.

23          MR. SKLAR:  Thank you, Your Honor.  I apologize for

24  the lack of jacket.  I thought that it was in the car and

25  didn't want to be late to your hearing.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    THE COURT:  Not a problem.

2    MR. SKLAR:  So this discovery request goes to the

3  heart of the dispute; namely, whether CommScope took adequate

4  protections to keep its confidential information and trade

5  secrets protected; whether their business has been adversely

6  impacted; whether their customer relationships have been

7  affected; whether competitors now have access to all of their

8  alleged confidential information trade secrets; what remedial

9  measures have been taken --

10    THE COURT:  Where is the information posted?

11    MR. SKLAR:  It's been posted on the dark web.

12    THE COURT:  Okay.  But not on the internet?

13    MR. SKLAR:  No.  Oh, well, the dark web is a part

14  of the internet, but it is on the dark web --

15    THE COURT:  The noncriminal internet.

16    MR. SKLAR:  It's -- correct.  It's on the dark web.

17    THE COURT:  Okay.

18    MR. SKLAR:  But so far we've been stopped from

19  getting any discovery on this.

20    THE COURT:  And do you know whether any of it

21  concerns BSAs?

22    MR. SKLAR:  Yes, our understanding is that it does

23  concern BSAs.

24    THE COURT:  How do you know that?

25    MR. SKLAR:  Well, I think that extent of our

1    investigation is privileged.

2           What I can say is that we did open the first page

3    of it.  On the first page, there was a folder called BSA.

4           THE COURT:  Okay.

5           MR. SKLAR:  While CommScope has tried to stop

6    discovery on the data breach at every turn, we do know that

7    their data was breached, data was taken; ████████████████

8    ██████████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████

10   ███████████; and CommScope's information has been on the dark

11   web since at least April.

12          We know that reporters have accessed the data.

13   ████████████████████████████████████████████ -- My CommScope

14   customer portal and internal internet were accessed, as well

15   as internal documents, invoices and technical drawings.

16          When we requested CommScope -- when we questioned

17   CommScope on this, they did not provide us any information.

18   ██████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████

20   ██████████████████████████

21          They have not updated their interrogatories.

22   They've not produced any documents.  They refuse to prepare a

23   30(b)(6) witness --

24          THE COURT:  Let me ask you something.

25          MR. SKLAR:  Yes.

```
|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)
```

1    THE COURT:  So your primary contention of relevance

2   is that the hack would demonstrate that they didn't

3   sufficiently protect their internal information such that it

4   could qualify as a trade secret?

5    MR. SKLAR:  Yes, that and then also we believe that

6   it's been open to the public and that would -- any trade

7   secret status that it had.

8    THE COURT:  Okay.  And open to the public meaning,

9   it's been on the dark web?

10    MR. SKLAR:  Yes.  But --

11    THE COURT:  Okay.

12    MR. SKLAR:  -- by being on the dark web, anyone

13   with internet access can access it through Tor, which --

14    THE COURT:  Well, you have to download Tor; right?

15    MR. SKLAR:  Sure.  Yeah, but it is a free browser

16   similar to Google Chrome or Microsoft Edge.

17    CommScope did agree to produce the ██████████

18   ███████████████████████████.  They have since told us that

19   they will not produce the ████████████████████████████████

20   ██████.

21    They also told us they were investigating what

22   relevant information was reached in the data breach.

23    They've also told us that they refuse to provide

24   whatever information that is.

25    We believe it's relevant --

1    THE COURT:  Now, one thing cited in your arguments

2  on this -- and you quoted -- I think it was the New Jersey

3  Defend Trade Secrets Act.  You said that -- oh, let me get

4  the exact quote.

5    MR. SKLAR:  I believe we cited on page 40 --

6    THE COURT:  Let me finish my thought, please.

7    MR. SKLAR:  My apologies.

8    THE COURT:  Okay.

9    In Rosenberger's portion of the joint letter at ECF

10  566, pages 42 to 43, citing the New Jersey Trade Secrets Act,

11  56:15-2, Rosenberger pointed out that a trade secret may lose

12  such protection when its value derives in part from not being

13  generally known to and not being readily ascertainable by

14  proper means by other persons.

15    Do you contend that the hack was obtained --

16  constitutes obtaining the information from CommScope by

17  proper means?

18    MR. SKLAR:  No, I don't think that the hack itself

19  obtained anything by proper means.  But I do think that it's

20  open on the internet that anyone can access.  And that --

21    THE COURT:  And it was made available by a criminal

22  act.

23    MR. SKLAR:  That is true, but we also cited case

24  law that says however it became made available, once it's on

25  the internet and now it does become public.

1          THE COURT:  Okay.

2          MR. SKLAR:  Further, we do believe that has gone to

3     damages because ███████████████████████████████████████

4     ██████████████████████████.  We know that CommScope's My

5     CommScope portal was opened and accessed and breached.  Their

6     internet was breached.  Invoices, technical drawings were put

7     onto the dark web.

8          We have cited secondary --

9          THE COURT:  That's a lot of information from the

10    first page.

11         MR. SKLAR:  No, it says that in the articles that

12    we cited.

13         THE COURT:  Oh.

14         MR. SKLAR:  Yeah.  -- yeah, and I brought those

15    articles with me.  Multiple different reporters have said

16    that.  It's in multiple articles that we have given to you.

17    ████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████

19    ████████████████████████████████████████████████████████████

20    ██████████████████████████████████████████████████████████████

21    ██████████████████████████████████████████

22         They've said that pretty much all of their damages

23    are now related -- all their damages -- all their business

24    troubles in the BSA industry is because of our clients.  And

25    this would show that it's not, that there are other factors.

1    And it's important for our experts to see this.  It's

2    important for our experts to see the ██████████████, to see

3    how these hackers actually got into the system, whether --

4    our security experts told us that's actually very important

5    for them to see.

6             And we've also provided articles which show that

7    the data breach affected CommScope's EBITDA by almost $2

8    million last year.  And we're not sure how much it affected

9    it so far.

10            While they have said that the information is

11   privileged, they refuse to identify the company -- ██████

12   ████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████

18   ████████████

19            And at the end -- we have offered to review the

20   data.  We have been threatened with ethical and criminal

21   allegations against us if we were to review the data.  We

22   think that the information is public since anyone can access

23   it.  There is no argument that the data would be purloined if

24   we did that.  ████████████████████████████████████████████

25   ██████████████████████████████████████████████████████████

1   ████████████████████   The burden is too high.

2          ████████████████████████████████████████

3   ████████████████████████████████████████████

4   ██████████████████████   And we need to know that for our

5   defenses.

6          THE COURT:  Okay.  I understand.

7          MR. SKLAR:  Thank you.

8          MR. KAHNKE:  So, Your Honor, I know you're well

9   familiar.

10          THE COURT:  Mr. Kahnke, I know who you are, but

11   just state it for the record.

12          MR. KAHNKE:  Thank you, Your Honor.  I'm Randy

13   Kahnke from Faegre Drinker on behalf of CommScope.

14          You know from your years of involvement with this

15   case, that we now have compelling evidence that Rosenberger

16   has our trade secrets, both hardware and software, and we

17   have more evidence that they've used them.  That's what we

18   know in this case.  That's the context.

19          And now, against all of that, we have Rosenberger

20   saying, "Okay.  We're going to try to look at this other

21   issue, where you were subject to a criminal hack by a Russian

22   criminal enterprise.  And we are going to try to use that to

23   somehow undermine what's been done in this case."  That's

24   what's going on.  I would suggest to you that it is a classic

25   "blame the victim" situation.

1              These hacks happen all the time.  Just last week,

2    "The Times" reported --

3              THE COURT:  Microsoft.

4              MR. KAHNKE:  Bingo.  The largest company in the

5    world by market cap, one of the most sophisticated companies

6    in this industry, the electronics service industry, their

7    senior executives' emails attacked.  And who did it?  The

8    Russians did it.  Right?

9    ██████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ██████████████████████████████

13   ██████████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ██████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████████████████████████████████████

25   ████████████████████████

1          THE COURT:  You waived privilege by producing it to

2   the adversary.

3          MR. KAHNKE:  Correct.  You waive privilege with

4   respect to that piece.  It's not a subject matter --

5          THE COURT:  The four corners of what was produced.

6          MR. KAHNKE:  You know that.

7          They say beyond that, that this information is

8   somehow relevant, that this breach is somehow relevant to

9   what's going on in this case.  It's legally irrelevant.  You

10  put your finger on it:  With proper means.

11         If -- they want to say that the information is in

12  the public domain -- it's not.  It is not on the public

13  internet.  It is on the dark web.  It is the playground of

14  criminals.  That is what the FBI recognizes.  That's what the

15  United States cybersecurity says.  Don't go there.

16         Everybody knows that that information is what it

17  is.  It's criminal information.  It's called the "dark web"

18  for a good reason.

19         It is not there as a result of proper means.  And

20  if it's not there as a result of proper means, it does not

21  erode the trade secret protection.  It's not the public

22  internet.

23         It also -- and Your Honor will know this -- it also

24  is not relevant to their claims in this case about how the

25  information was misappropriated, our claims about how the

 1  information was misappropriated.  In order for this

 2  information to be relevant, there has to be a correspondence,

 3  a relationship between the manner in which this information

 4  was, even by their account, made public -- okay? -- a data

 5  breach and the misappropriation.  We have no correspondence

 6  or relationship between those two.  There's a data breach.

 7  And that has nothing to do -- see, the first issue that

 8  you've already talked about here today in your ruling.  We

 9  have former employees who took this information and took it

10  over to Rosenberger where they used it.  It has nothing to do

11  with the data breach.  That happened years ago.  The data

12  breach just happened last March.  There's no correspondence

13  there.  And the law is clear that if there's no

14  correspondence, there's no relevance.

15         Beyond that, they say it's relevant to reasonable

16  efforts.  They have had extensive discovery over the course

17  of years and over the course of many hours and many witnesses

18  of deposition testimony about the efforts that CommScope

19  takes to protect the confidentiality of its trade secrets.

20  They have that information.  They already know that

21  information.  They know what has -- what CommScope does.

22  They're going to make the arguments that they will make about

23  that.

24         They cannot cite a single case -- and I just want

25  to be real clear about what the cases are that have been

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1  cited here.  They have not cited -- I don't believe they can

2  cite a single case that says what happens in some satellite

3  data breach litigation or data breach situation is relevant

4  to what's going on in this case regarding trade secrecy.

5  There's not a single case that they cite on it.  And I don't

6  believe that there's a single case available.

7           And I think it makes good sense that there are no

8  cases because these breaches are ubiquitous, as Your Honor

9  knows.  And if we go down that path where we're saying that a

10 data breach is somehow relevant to a trade secret case, we

11 are going to have a case within a case -- every time you've

12 got a trade secret case and you've got a data breach, you're

13 going to have a case within a case.

14          In this case, ███████████████████████████████

15 ████████████████████████████████████████████████████████████

16 ██████████████████.  Not a single case that they can cite that

17 says that, that it's relevant.  And I think for good reason.

18          Similarly, not a single case that they can cite

19 that says if you put information on the dark web, not the

20 public internet where you can get it with a Google search,

21 but on the criminal playground, if you put information there

22 when the information is obtained by improper means -- and,

23 man, if there's anything that's improper means, a criminal

24 hack certainly is -- there's not a single case they can cite

25 that says that's relevant to the erosion of trade secrecy.

1    Not one.

2            That leaves us to their, I guess, final proposal,

3    which is that counsel themselves should be allowed to review

4    this information.  I'm respectful of the questions Your Honor

5    asked of counsel because you, at least, got a bit of an

6    answer.  We got nothing.

7            We're very concerned about it.  We're very

8    concerned about what's happened here.  You understand the

9    ethical rules.  We know that.  They've asked for permission

10   to review this information.  And I think that's very telling.

11           If this information was available on the internet,

12   available through a Google search, there would be no request.

13   They're aware of that.  It's an inappropriate thing to do,

14   and the ethics rules are clear on it.

15           I'll stop there unless Your Honor has questions.

16           THE COURT:  I don't.  Thank you.

17           MR. KAHNKE:  Thank you.

18           THE COURT:  Okay.

19           On this issue, which I've labeled Issue 5 -- did

20   you want to say something else?

21           MR. SKLAR:  Yeah, I just had, like, two or three

22   quick --

23           THE COURT:  Sure.  Come on up.

24           MR. SKLAR:  Thank you very much.

25           THE COURT:  And just for the reporter, say your

1    name again when you come to the podium.

2              MR. SKLAR:  Thank you.  Andrew Sklar from King Wood

3    Mallesons on behalf of defendants.

4              THE COURT:  Oh, he's not the court reporter.  The

5    court reporter is the recording.

6              MR. SKLAR:  Understood.  Thank you.

7              THE COURT:  That's my law clerk.

8              MR. SKLAR:  Sorry.

9              So, first, when he was talking about privilege, I

10   just want to point out that under Federal

11   Rule 26(b)(3)(A)(2), if the information is not accessible

12   through any other means, then the work product privilege

13   would not apply.

14             And for just standard privileges to apply, then it

15   would have had to have been made primary -- for the primary

16   purpose of litigation.

17             There are news -- they have put out statements in

18   news articles saying that this was made to see what data was

19   leaked, to do a full investigation on it.  They have never

20   mentioned any litigation.  First time was to us.  We didn't

21   know who the attorneys were for that.  ████████████

22   ████████████████████████████████████████████████████

23   ████████████████

24             In all the cases they cited, there was a two-tier

25   investigation.  So there was one investigation for the legal

 1  team.  There was another investigation showing for -- for the

 2  company itself.  And in those cases, the legal team's

 3  investigation was privileged, but the rest of the information

 4  and the rest of the investigation was not privileged.

 5         Second, I know he said that we asked for

 6  permission.  We did not -- for permission.  We asked if they

 7  objected to it because they hinted that they would do

 8  something.  And because they threatened us with ethical and

 9  criminal sanctions with this, we, obviously, wanted to go to

10  the Court first.

11         Next, he kept pointing out that we pointed out no

12  cases for a data breach.  And what we have pointed out are

13  multiple cases where information could be posted online, had

14  been posted in news groups and posted in groups online, small

15  areas of the internet with less than the millions of people

16  who view the information on the dark web.  I don't think it

17  matters if it was from a data breach or if it was from the

18  dark web.  He was saying we have no cases that say that this

19  is a leak.  There are no cases going the other way either.

20  This is a novel issue.

21         THE COURT:  Wrap it up.

22         MR. SKLAR:  Yeah, I'm sorry.

23         Lastly, I just want to point out that CommScope's

24  own website does point out that a business will lose its

25  reputation.  We cited that in our papers.  And that could

1   take years to come back.  And so I think that supports our

2   damages arguments.

3            And I also would just, at the very least, like a

4   commitment for them to produce the executive summary because

5   they did tell us they would be producing that.  They agreed

6   to it.  They said in their papers.

7            THE COURT:  They offered it to you.  You declined;

8   right?

9            MR. SKLAR:  Thank you.

10           THE COURT:  Have a seat.  Rosenberger seeks

11  information on a data breach of CommScope perpetrated by

12  criminal hackers from Russia.  Apparently, the hackers posted

13  information they obtained on the dark web.

14           The Court finds Rosenberger's request is neither

15  sufficiently relevant nor proportional to this action to

16  order the requested discovery.  In briefing this issue, the

17  parties seem to have lost sight of the forest for the trees.

18  The forest, as this Court sees it, is as follows.

19           CommScope was the victim of a crime committed by

20  hackers, seemingly very sophisticated ones and possibly

21  state-sponsored actors.  CommScope is not alone.  Legions of

22  parties who responsibly protect their confidential

23  information -- hospitals, police stations, even the federal

24  courts through the SolarWinds breach, and last week even

25  Microsoft -- have similarly been victims of criminal hacking.

1    Therefore, the Court does not start with the

2    presumption, as Rosenberger urges, that CommScope, having

3    been victim of a data breach, necessarily failed to take

4    adequate security measures to qualify its proprietary

5    information in BSAs as trade secrets.

6    The question before the Court is whether the recent

7    hack of CommScope is relevant to whether CommScope

8    sufficiently protected its internal information for it to

9    qualify for trade secret protection.

10    A trade secret is entitled to legal protection when

11    its owners have taken reasonable measures to maintain its

12    secrecy.  See Oakwood Laboratories LLC v. Thanoo, 999 F.3d

13    892 at page 905, a Third Circuit decision from 2021.

14    However, it may lose such protection, as

15    Rosenberger points out, when its value derives in part "from

16    not being generally known to and not readily ascertainable by

17    proper means by, other persons who can obtain economic value

18    from its disclosure or use."  See Rosenberger's portion of

19    the Joint Letter at 566, pages 42 to 43, citing New Jersey

20    Trade Secret Act 56:15-2.

21    There is no question that "proper means" were not

22    used to ascertain CommScope's information by the criminal

23    hackers.  Proper means do not include criminal acts.

24    Therefore, the fact that CommScope was the victim of a

25    criminal hack is not relevant to the issues of whether

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1   CommScope's design files are entitled to trade secret status

2   under New Jersey law.  Compare Hurry Family Revocable Trust

3   v. Frankel, 2023 WL 23805 at *8, a Middle District of Florida

4   decision from January 3, 2023, which parenthetically states

5   "intentional publication of material will destroy its trade

6   secret status."  See also Merckle GmbH v. Johnson & Johnson,

7   961 F. Supp. 721 at page 731, a District of New Jersey

8   decision from 1997.  And, parenthetically, that case states,

9   "A substantial element of secrecy must exist so that, except

10  by the use of improper means, there would be difficulty in

11  acquiring the information."  And that's further quoting the

12  Restatement of Torts.

13         Moreover, the fact that portions of CommScope's

14  information allegedly have now been made public through

15  criminal activity does not waive its right wholesale to trade

16  secret protection, as Rosenberger argues.  And

17  parenthetically, I will say that I do not consider

18  publication on the dark web as being made public, given the

19  additional and warned-against steps needed to access the dark

20  web.

21         In any event, inadvertent revelations of

22  confidential information does not waive its protected status.

23  Instead, the information loses its protection only if it is

24  made "generally known to the relevant people, typically

25  meaning competitors."  Syncsort Inc. v. Innovative Routines,

1   2011 WL 3651331 at *14, a District of New Jersey decision

2   from August 18, 2011.

3         Rosenberger has not introduced sufficient evidence

4   that the evidence posted on the dark web has become "widely

5   available" information as to obviate trade secret protection

6   or evidence that "competitors or unauthorized persons

7   accessed or even attempted to access the information," such

8   as to deprive the information of its economic value.  See id.

9   at *15.

10        Therefore, the Court finds the 2023 data breach is

11  not sufficiently relevant to the issues present in this case.

12        Furthermore, the time period of the hack, in March

13  of 2023, also underscores its lack of relevance to this case.

14  Whatever security procedures were in place in 2023 at the

15  time of the recent data breach may well have been quite

16  different from those in place prior to 2019, which is the

17  time period at issue in this action.

18        Nor is the information sought by Rosenberger here

19  proportional, even if it had some tangential relevance,

20  assuming *arguendo*.  Rosenberger seeks broad discovery into

21  the hack.  But Rosenberger has had years to discover

22  CommScope's means of protecting its alleged trade secrets, a

23  key and obvious element in determining whether or not a trade

24  secret exists.  See Merckle GmbH v. Johnson & Johnson, 961 F.

25  Supp. 721 at page 731, a District of New Jersey decision from

1    1997.

2         Accordingly, the relevant information as to what

3    steps CommScope took to protect its trade secrets has been

4    discoverable since the commencement of discovery in this

5    long-pending litigation.  It cannot reasonably be considered

6    to have emerged only after CommScope was hacked in 2023.

7         This, again, suggests that Rosenberger's request is

8    not proportional.  Rosenberger's request for this Court to

9    compel any information concerning the criminal hack of

10   CommScope is denied.

11        Issue 6.

12        Your name again, sir?

13        MR. MILLER:  Dan Miller, from King Wood & Mallesons

14   on behalf of defendants.

15        So this is a -- it's a simple issue, and it's a

16   small issue.  I think it's a really discrete issue.

17   ████████████████████████████████

18   ██████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████

21   ██████████████████████████████████████

22   ███████████████████████████████████

23      █████████████████████████████████████████

24   █████████████████████████████████████████████████

25   ████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1    ██████████████████████████████

2         THE COURT:  Do you dispute that copies of the

3    deleted old version of AAAP were retained in CommScope's

4    central repository?

5         MR. MILLER:  We have been provided no evidence that

6    anything was retained.  We have been provided no log of where

7    any such deletions occurred.

8         THE COURT:  Okay.  They indicated that they

9    produced the information from the central repository to

10   Rosenberger several years ago.

11        MR. MILLER:  I think they produced the source code.

12   But what they didn't produce was the result of the deletions.

13        THE COURT:  What do you mean by the "result of the

14   deletions"?

15   ████████████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████

18   ██████████████████████████████

19   ██████████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████

24   ██████████████████████████████████████

25   ████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

1

2

3

4

5

6   --

7        THE COURT:  Can I just back up a little bit.

8        MR. MILLER:  Yes, Your Honor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)





|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

78



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)







|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    --

25            THE COURT:  What does that mean?

1          MR. MILLER:  It's like a --

2          THE COURT:  It helps you design --

3          MR. MILLER:  No.  It's a software module; right?

4          THE COURT:  Okay.

5          MR. MILLER:  You can take this -- you can take this

6    executable, I could email someone, they can run it.  You

7    could put it anywhere.  This thing could exist --

8          THE COURT:  Okay.

9          MR. MILLER:  Right?  It's not the -- it's not the

10   source code itself.  It's the executable version.  It's

11   the -- like, Word; right?

12         THE COURT:  Okay.

13         MR. MILLER:  Right?  And you send a copy of Word,

14   and somebody now is running Word over there.  You know, it's

15   a little more complicated, but it's the same thing.

16         THE COURT:  Okay.  I understand.

17   ███████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████

20   ███████████████████████████████████████████

21   █████████████████████████████████████████████████████████

22   ████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   █████████████████████████████████████

25   ███████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17          THE COURT:  Mm-hmm.

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11            THE COURT:  Okay.

12            If you would sit down for a minute.  I want to hear

13    from -- I'll have you back up again.

14            MR. MILLER:  All right.

15            THE COURT:  But I want to hear what CommScope says.

16    I'm struggling to understand all this.

17            MS. SALLSTROM:  Thank you, Your Honor.  This is

18    Anna Sallstrom of Faegre Drinker for CommScope.

19            And I can simplify this.

20            THE COURT:  Good.

21            MS. SALLSTROM:  In short, Your Honor's

22    understanding of Mr. Patel's testimony at his recent full

23    merits deposition is correct.

24

25

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)



24              THE COURT:  Yeah.

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)





1

2          THE COURT:  Okay.

3

4

5

6

7

8

9

10

11

12

13          THE COURT:  Okay.  What about who had access to the

14   previous version?  If they have the previous version, both

15   source code and executables, then I guess the next question

16   is what about Mr. Miller's desire to know who had access to

17   it within CommScope?

18          MS. SALLSTROM:  So Rosenberger already has

19   conducted significant discovery on that topic.  They've asked

20   witnesses who had access to AAAP.  There's been, as you've

21   heard, extensive discovery already on reasonable-efforts

22   related issues like that one.  The script is very, very far

23   from their only source of information on that topic.

24

25

1  █████████████████████████████████████████████████████

2  ███████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ██████████████████████████████████ --

5          THE COURT:  What's the harm of producing the

6  script?

7          MS. SALLSTROM:  Right.

8          So the first point is really a practical one.  This

9  is far too late; right?  So one harm to CommScope is simply

10 that we know that counsel for Rosenberger --

11         THE COURT:  This whole case is far too late.

12         But what's the prejudice?

13         MS. SALLSTROM:  So there's a lot of water under the

14 bridge; right?  This case has been going for a long time.

15 Depositions were conducted on this topic in January 2020.

16 They knew about the script then.  We briefed these issues in

17 our PI motion -- right? -- and CommScope's motion for a

18 preliminary injunction.  They never asked for it.

19         Rosenberger's prior counsel, Milbank had every

20 opportunity to send us -- to submit a discovery request --

21 right? -- in full merits discovery asking for the script,

22 which we know they knew about.  And they didn't.

23         Instead, they made a strategic decision to rely on

24 the extensive other information available to them on these

25 topics -- much of which -- on this topic, much of which I've

 1   just run through.

 2          And at this point we're -- in fact, counsel for

 3   Rosenberger didn't reraise the PowerShell script with us

 4   until Mr. Patel's deposition, which took place six months

 5   after the close of written discovery.  And there, as we've

 6   discussed, they learned nothing new.  There's just simply no

 7   good cause here.

 8          And that's our primary argument.

 9          THE COURT:  Okay.  Thank you.

10          MS. SALLSTROM:  Thank you, Your Honor.

11          THE COURT:  All right.

12          I really want to resolve -- oh, go ahead.  Go on.

13   Yeah.

14          MR. MILLER:  Just a couple of --

15          THE COURT:  I promised you and ...

16          MR. MILLER:  You did.  I feel like ...

17          All right.  Dan Miller again, KWM.

18          I think what's telling, what you didn't hear is

19   CommScope never said it's not relevant.  And it is relevant

20   because it goes to key points of how it was kept and

21   maintained.  They said we could have asked for it.  I would

22   say that they always had a duty to produce it and disclose

23   it.

24          THE COURT:  But Rosenberger [verbatim], clearly the

25   record shows that the PowerShell script was mentioned years

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

 1   ago.

 2           MR. MILLER:  Sure, it was known.

 3           THE COURT:  And if it was, why didn't you waive the

 4   right to seek it and -- well --

 5           MR. MILLER:  Because --

 6           THE COURT:  -- while discovery was open?

 7           MR. MILLER:  Because the testimony was consistent.

 8   ████████████████████████████████████████████████████

 9   ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████

15              ████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ██████████

18              ████████████████████████████████████████

19   ████████████

20           They haven't said it's onerous.

21           THE COURT:  And there's no spoliation because it

22   didn't disappear.  It has to be irretrievably lost or

23   altered.  So to the extent there are shades of spoliation

24   here, it's not -- that dog won't hunt.

25           MR. MILLER:  Well, if -- we would know from the

 1  PowerShell script -- also they -- ███████████████████

 2  ███████████████████████████████████████████████

 3  ███████████████████████████████████████████████

 4          THE COURT:  But you don't dispute that you have not

 5  only the source code but executables for the previous version

 6  of AAAP.

 7          MR. MILLER:  But that doesn't tell me --

 8          THE COURT:  Do you dispute that?

 9          MR. MILLER:  I do not.

10          But that doesn't tell me where it was.

11          THE COURT:  Okay.  So that's the one piece that's

12  missing.

13          But I thought that's what you also said the

14  PowerShell script won't tell you.

15          MR. MILLER:  It will tell me where they looked for

16  deletions.  It will also tell me whether they created a log

17  file at the time.  I don't know if they created a log file of

18  deletions.  If they did, they haven't produced it.  And the

19  PowerShell --

20          THE COURT:  That's not --

21      (Simultaneous conversation)

22          MR. MILLER:  -- if the PowerShell script says that

23  they did because you would pipe it to a file if you --

24          THE COURT:  I see.

25          MR. MILLER:  -- get the list.

 1              I don't know.  They haven't produced it.  And you

 2    don't -- what they can't do is cherry-pick the evidence.

 3    They can't now just want to rely on Mr. Patel's deposition

 4    testimony when we could determine whether that's true or not

 5    based simply on this one file.

 6              THE COURT:  Okay.  This is what I'd like to do.

 7    You know I am not a punter; right?  I may adjourn hearings,

 8    but when I get to them, I want to settle all family business

 9    and be done with it.

10              But this is one issue -- I really didn't grasp it

11    in the briefing.  I didn't get from Rosenberger's arguments

12    what was relevant.  I understand better now at oral argument.

13              But I want you to make one more effort to resolve

14    it.  And, it not, then one short submission, joint

15    submission, and drill down on what Rosenberger is seeking

16    here that it contends is relevant and that hasn't been

17    answered by the previous productions or discovery.  Okay?

18              MR. MILLER:  Yes, Your Honor.

19              THE COURT:  And then why what you seek you believe

20    will show that; you can't know but why you have grounds to

21    believe that.  And then let CommScope see it.  And I'll -- I

22    promise I won't delay you long in deciding it.  So I'll

23    reserve on this issue.  Thank you.

24              MR. MILLER:  Thank you, Your Honor.

25              THE COURT:  Okay.  All right.

1    Let's go -- I think we're on the final issue.

2    Issue 7 concerning the deposition of Mr. Bisiules, if I'm

3    pronouncing that correctly.

4    MR. FILARDO:  Yes, good afternoon, Your Honor.

5    Vincent Filardo again.

6    This is a -- sort of a related issue because it

7    arose out of the same set of facts.  And I want to refer the

8    Court to Exhibit JJ, which is the relevant portions of the

9    transcript of Mr. Bisiules's disposition.

10    THE COURT:  Yeah, I read it.

11    ████████████████████████████████████████████████████

12    ████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████

14    ██████████

15    THE COURT:  Enabled people to misappropriate their

16    stuff.

17    MR. FILARDO:  Yeah, exactly.  They were able to

18    now --

19    THE COURT:  It's not that nefarious.

20    ████████████████████████████████████████

21    ████████████████████████████████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████████████

24    ████████████████████████████████████████████████

25    ████████████████████████████████████████████████

|Hearing
|19-cv-15962, January 25, 2024
|REDACTED (available for all parties and the public)

 1  ████████████████████████████████

 2  ███████████████████████████████████████████

 3  ██████████████████████████████████████████████

 4  █████████████████████████████████

 5  ████████████████████████████████████████

 6  ██████████████████████████████████████████████

 7  █████████████████████████████████████████████

 8  █████████████████████████████████████████████

 9  ████████████████████████████████████████████

10  ██████████████████████████████████████████████

11      THE COURT:  Right.

12  ████████████████████████████████████████

13  ████████████

14  ████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ██████████████████████████████████████

17      THE COURT:  Right.

18      MR. FILARDO:  -- █████████████████████.

19      He refused to answer that.  █████████████

20  ███████████████████████████████████████

21  █████████████████████████████████████

22  ████████████████████████████████

23  ██████████████████████████████████████████████

24  █████████████████████████████████████████████

25  █████████████████████████████████████



1

2

3

4

5

6

7

8    --

9        THE COURT:  Okay.  Go back to the deposition.

10        MR. FILARDO:  So that's --

11        THE COURT:  What was wrong in invoking privilege?

12        MR. FILARDO:  So, in essence, I think -- you know,

13  I don't think that it was protected by privilege for him to

14  refuse to answer a question about whether he made an effort

15  to preserve documents, whether he searched for documents on

16  his work -- or whether he searched for documents on his home

17  computers or files.  I don't think any of that was

18  privileged.

19        He believed it was because his counsel said, "I

20  want to caution you that if we discussed this, you know, then

21  don't waive the privilege."

22        THE COURT:  Okay.

23        MR. FILARDO:  Counsel directed him not to answer,

24  but you saw the result.

25        THE COURT:  I understand.

1          MR. FILARDO:  And that's it.  That's the point that

2     I wanted to make, and I think that's what the deposition

3     transcript shows.

4          THE COURT:  Thank you.

5          MS. MAPPES:  Thank you, Your Honor.  Harmony

6     Mappes, again for CommScope.  I will be quick.  I have three

7     points.

8          THE COURT:  Okay.

9          MS. MAPPES:  Number one, counsel followed a very

10     standard practice in giving a cautionary note not to reveal

11     privileged information.

12          THE COURT:  Right.

13          MS. MAPPES:  Not only is it standard, Rosenberger

14     gave this exact same guidance to many of its witnesses

15     throughout those depositions.

16          Point number two, counsel did not instruct

17     Mr. Bisiules not to answer the questions.  Mr. Bisiules

18     answered the questions to the best of his ability, including

19     specifically saying he did not destroy any documents.

20          Point number three, on these facts, Rosenberger has

21     not established good cause to reopen the deposition or to

22     compel a declaration.  If good cause exists to reopen here

23     based on that sort of cautionary instruction, then good cause

24     would exist practical in all cases, including other

25     depositions in this case.  Instead of --

|Hearing
|19-cv-15962, January 25, 2024                                          98
|REDACTED (available for all parties and the public)

1          THE COURT:  I was going to ask counsel why they

2     didn't call me from the deposition.  I don't think it was in

3     Hong Kong.  He's a U.S.-side witness.  Right?

4          MS. MAPPES:  It was a U.S.-side witness,

5     Your Honor, and instead of trying to work out is there some

6     discrepancy here about what the witness is understanding, the

7     deposition was adjourned, and there was no further effort

8     made or no further questions asked to try to sort this out.

9     Mr. Bisiules was not instructed not to answer the question.

10    There's no -- I mean, counsel's argument relies on

11    spoliation.  There's no evidence of that here, and they have

12    not met the good cause standard to reopen the deposition.

13         THE COURT:  Okay.

14         MS. MAPPES:  Thank you, Your Honor.

15         THE COURT:  I don't think you need to say anything.

16         All right.  In the final issue presented by the

17    parties, Rosenberger seeks a declaration or additional

18    deposition testimony from CommScope's director of BSA

19    engineering, Pete Bisiules, on the ground that he improperly

20    refused to answer certain questions at deposition.

21         The Court has reviewed the deposition transcript at

22    issue.  There were only a few questions the witness refused

23    to answer on privilege grounds without an instruction from

24    his attorney not to answer the question.

25         What should have happened is the witness should

1   have conferred with his counsel about whether the information

2   sought was privileged -- it's one of the few exceptions that

3   you can confer when sworn with your counsel privately -- and

4   the attorney should have given the witness an instruction

5   about whether he could answer the question or not or parts of

6   it and made a record of the private conference and its

7   outcome.  See Hall v. Clifton Precision, 150 F.R.D. 525 at

8   529 to 530, an Eastern District of Pennsylvania decision from

9   1993.

10          But instead, it seems the layperson witness

11  struggled to decide himself whether the information sought

12  was privileged.

13          The Court will make rulings now on the only

14  questions the witness declined to answer in the deposition

15  excerpt provided to the Court.

16          First, Mr. Bisiules self-invoked privilege in

17  declining to answer whether he and others at CommScope "made

18  a concerted effort to preserve documents and records as a

19  result of this litigation."  And that's from Exhibit JJ at

20  pages 240 to 241.

21          There was a form and foundation objection and a

22  direction not to reveal the content of discussions with

23  counsel.

24          And then the witness said he could not answer the

25  question.

1     The Court finds he ought to have answered the

2  question about whether he personally made efforts to preserve

3  documents and records.  But there was no foundation to

4  establish whether he was familiar with what others at

5  CommScope did, and he testified in 30(b)(1) and not a

6  30(b)(6) capacity, so he need not have answered that portion

7  of the question about what others did.

8     But there is no privilege as to whether he

9  preserved documents and records because it simply involves

10 his testifying as to his own actions and matters within his

11 personal knowledge and, as it was phrased, it would not call

12 for revealing what legal counsel may have advised him.

13    Second, Mr. Bisiules was asked whether he received

14 a litigation hold letters instructing him to preserve

15 documents, and he declined to answer on the grounds of

16 privilege.  Both CommScope and Rosenberger cite authority

17 agreeing with Mr. Bisiules's conclusion that a litigation

18 hold letter is privileged.  See ECF 566 at pages 77 and 79,

19 absent spoliation, which was not alleged or shown by

20 Rosenberger.

21    So he properly declined to answer about the

22 litigation hold letter, though his counsel should have

23 instructed him not to do so.

24    Finally, there were several additional questions

25 about whether the witness searched his work files and

1   personal devices for relevant information as part of this

2   litigation.  See Exhibit JJ at pages 243, 244, and 245.  He

3   ought to have answered those questions, which did not, as

4   phrased, seek privileged information.

5         So Rosenberger's request on this issue is granted,

6   consistent with what I just said.  Rosenberger's counsel may

7   take another one-hour deposition of Mr. Bisiules on -- to ask

8   what he did and what he searched to seek documents relevant

9   to this litigation and what efforts he made to preserve

10  documents that might be relevant.  Or counsel may work out a

11  declaration answering these questions, if Rosenberger

12  prefers, but that's Rosenberger's choice.

13        All right?  That's the last issue.

14        Is there anything else the parties wish to raise,

15  Mr. Kahnke?

16        MR. KAHNKE:  Just one thing, Your Honor, you've

17  directed additional documents to be produced.  We do have a

18  deadline coming up for expert reports.

19        THE COURT:  Right.

20        MR. KAHNKE:  I don't know if we might request a

21  specific deadline by which that information be produced or

22  get guidance from the Court.

23        THE COURT:  Yeah.  I mean, that and we're reopening

24  some depositions, so I don't know how that squares with your

25  existing expert reports.  I don't know what overlap there is

1   between expert and fact discovery.

2         So I'm going to issue my order -- I don't like to

3   just pick out of a vacuum, dates for production.  I like them

4   to be realistic.

5         So why don't counsel confer -- you know, or counsel

6   might appeal.  So this is what I'm going to do.  I'm going to

7   memorialize really in bare-bones form in an order what the

8   bottom line is of what I held.  This transcript will be

9   prepared.  This will be my oral opinion supporting it.  I

10  won't put dates, and you take what I did and confer with one

11  another and come up with a timeline and compare it to the

12  expert reports and -- you know a lot more about all that than

13  I do of how it's going to affect expert.  Send me a

14  subsequent submission, preferably joint, about dates and how

15  the expert schedule is affected.

16        I think I just pushed out the expert schedule by

17  quite a bit.  So...

18        MR. KAHNKE:  Understood.  Thank you.

19        THE COURT:  All right.

20        Mr. Filardo, anything else?

21        MR. FILARDO:  Nothing further from defendants,

22  Your Honor.

23        THE COURT:  Okay.  Thank you.  We're off the

24  record.

25                    (Conclusion of proceedings)

|Hearing
|19-cv-15962, January 25, 2024                                          103
|Certification

```
 1                          Certification

 2        I, SARA L. KERN, Transcriptionist, do hereby certify

 3   that the 103 pages contained herein constitute a full, true,

 4   and accurate transcript from the official electronic

 5   recording of the proceedings had in the above-entitled

 6   matter; that research was performed on the spelling of proper

 7   names and utilizing the information provided, but that in

 8   many cases the spellings were educated guesses; that the

 9   transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11        I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ Sara L. Kern                     1st of February, 2024
        _____      _____
19      Signature of Approved Transcriber            Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services, LLC
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25
```